**In re Kandala Ram CHARY, Debtor.**

**Bankruptcy No. 91–12120.**

United States Bankruptcy Court,
W.D. Tennessee,
Eastern Division.

March 13, 1996.

P. Preston Wilson, Memphis, TN, for debtor.

**MEMORANDUM OPINION RE FINAL APPLICATION FOR ALLOWANCE OF COMPENSATION AND EXPENSES FOR TRUSTEE'S ATTORNEYS AND TRUSTEE'S ACCOUNTANT/FINANCIAL CONSULTANT, OF APPLICATION FOR ENHANCEMENT OF FEES AND OF APPLICATION FOR ALLOWANCE OF TRUSTEE'S COMMISSION**

G. HARVEY BOSWELL, Bankruptcy Judge.

This matter comes before the Court on the application for compensation filed by the case trustee, an objection filed by the U.S. Trustee and the entire case record. The Court heard arguments of the parties on the 6th day of March, 1996. At the hearing the parties stipulated that the matter in controversy with the portion of the application seeking compensation and enhanced compensation for Midtown Financial Consulting had been resolved. The parties further stipulated that there was no dispute regarding the requested fees and expenses for the attorney for the case trustee, Gotten, Wilson & Savory. Further the parties stipulated there was no dispute with the commission requested by the trustee. The sole dispute before the Court is whether the attorney for the trustee is entitled to an enhancement of its fee as requested. After hearing the stipulations of the parties, the Court approved the fees requested by Midtown Financial Consulting as amended, allowing Midtown to receive compensation for the entire case at a rate of $100 per hour. The Court further approved the requested commission of the case trustee.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The following shall serve as the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052

The trustee was appointed in the instant case on February 26, 1992. On April 24, 1992, the Court approved the employment of the trustee and the law firm of which the

trustee was a member, Evans & Petree (E & P), as the trustee's attorney. On August 1, 1995, the trustee left E & P and joined the law firm of Gotten, Wilson & Savory ("GWS"), and the trustee has continued to act as the trustee's attorney in his new law firm.

The attorney for trustee has been awarded interim compensation on ten occasions from the appointment an February 26, 1992 through June 15, 1995. The instant application seeks final approval of all compensation, expenses paid to date and approval of compensation and expenses for the last billing period from June 16, 1995 until the closing of this case, which is estimated to be December 15, 1995.

■ The instant case commenced on August 26, 1991, when the debtor filed his voluntary petition in this Court's office in the Eastern Division in Jackson, Tennessee. Ms. Linda Moore was appointed as the initial case trustee. Ms. Moore resigned on February 26, 1992, and P. Preston Wilson ("trustee") was appointed as successor case trustee, and he has served in that capacity ever since. Upon his appointment, the trustee sought and received court approval to employ himself and his law firm, E & P, as attorneys for the trustee and MFC as financial consultant and accountant for the trustee. E & P and GWS served as attorneys and MFC served as accountant for the trustee throughout the administration of this case. During the administration of this case, the trustee also employed as special counsel the law firms of The Law Office of William M. Gotten ("Gotten"); Humphreys, Dunlap, Wellford, Acuff & Stanton ("Humphreys, Dunlap"); and Kizer, Bonds, Boswell & Crocker ("Kizer, Bonds").

The following is a summary of the debtor's financial affairs which needed to be investigated at the time the case was filed:

(1) The trustee and MFC first undertook to investigate the debtor's medical practices. Prepetition, he had developed and sold a medical practice and four kidney dialysis centers operating in Jackson, Tennessee, and three other West Tennessee locations; however, several contractual and financial obligations continued after the sales and existed at the time the petition was filed. Also, at the time the petition was filed, Dr. Chary was again practicing medicine as an employee of his new professional corporation, Madison Nephrology Clinic, P.C., under an employment contract.

(2) Prepetition, the debtor had been engaged in numerous business activities unrelated to his medical practices. He held interests in various corporations, general and limited partnerships, and real estate projects. These included Jackson Athletic Club, Inc., Health Development, Inc., Partners Five, Partners Ten, Foxworth Developers, Inc.; Heroes, Inc., Whalley Properties, Boulevard Properties, International Development, Inc., Global Resources, Inc. and four duplexes in Milan, Tennessee.

(3) Dr. Chary had been divorced approximately three weeks before his petition was filed. His former wife lived in the marital home and was in possession of numerous items of personal property in which the estate had an interest but which were subject to liens then held by the FDIC.

(4) There were several prepetition transfers which needed to be examined, especially the debtor's sale of his medical practices, Jackson Nephrology Clinic, P.C. and Regional Dialysis Clinics, Inc., and his transfers of large sums of cash to a business venture known as International Investments, Inc.

(5) At the time the petition was filed, the debtor was a defendant in a $2,700,000 malpractice suit, and he had outstanding gambling debts of $1,700,000 and federal tax obligations of at least $72,097.64. The total claims listed in the debtor's petition exceeded $9,000,000.

The trustee also had to operate the four duplexes in Milan, Tennessee ("Milan Duplexes"). Some were occupied, but others were vacant. They were uninsured, had no management and were in need of maintenance and repairs. At one point it was necessary to file a forcible entry and detainer suit to evict a nonpaying tenant and the trustee retained Kizer, Bonds for this pur-

pose. The Milan Duplexes also were a source of cash for the benefit of the estate. The trustee improved the Milan Duplexes during his stewardship and sold them in January, 1994, for a total sale price of $175,500, with net proceeds to the estate of $151,818.

As a result of investigating the debtor's financial affairs, the trustee's attorney and MFC identified potential legal grounds to avoid liens against the Milan Duplexes and certain real property located in Jackson, Tennessee, on the Highway 45 By–Pass ("By–Pass Property"), owned by a partnership. Whalley Properties, in which the debtor was a 50% partner. E & P, on behalf of the trustee, filed a complaint under § 547 of the Code to avoid the first mortgage on the Milan Duplexes as a preference. The trustee also filed a complaint under § 544 of the Code to avoid the first mortgage/lien on the debtor's interest in the By–Pass Property as improperly perfected. Because of a conflict of interest, E & P withdrew from representing the trustee in the adversary proceeding regarding the By–Pass Property after the complaint was filed and the trustee retained Gotten to proceed with the suit, which he did to conclusion. Both suits were complex and vigorously litigated, but both were ultimately successful and were settled on terms very favorable to the estate.

The trustee and his attorney then negotiated the sale of the Milan Duplexes and the By–Pass Property. The Milan Duplexes were sold for a net sales price of $151,818; after a payment of $15,000 to first mortgage holder FDIC as part of a negotiated settlement, the estate received $136,818. The By–Pass Property, after an opening bid of $175,000, was ultimately sold for $390,000. After payment of the purchase money first mortgage on the property (which was not disputed), allocation of the proceeds between the estate and the estate's 50% general partner, Brenda Whalley, and a $5,000 settlement payment to the Bank of Dyer, the estate netted $135,920.

The trustee and MFC met several times with agents of the FBI and IRS Criminal Investigation Division who were investigating the debtor's assets and financial transactions. These meetings revealed that immediately prepetition the debtor had engaged in transactions and undertaken obligations related to his divorce which were not reported in the petition and were perceived by the trustee's attorney as fraudulent. E & P filed an adversary proceeding complaint against the debtor, his former wife Bonnie Chary and one Dr. Shirish Joglekar to recover assets which the trustee alleged were fraudulently transferred. This lawsuit was settled with the debtor agreeing to pay $33,000 into the estate, which he has done.

The debtor's petition listed claims totaling over $9,000,000. The total of claims filed was over $8,000,000, which included $140,000 of priority tax claims. The trustee, through his attorneys, filed numerous objections to claims. Most were filed by E & P, but due to a conflict of interest, the trustee retained the law firm of Humphreys, Dunlap to review and object to the claims related to and arising out of the debtor's interest in Heroes, Inc. As a result of the efforts of the trustee's attorneys, the total of allowed, general unsecured claims has been reduced to approximately $720,320, and the total of allowed, priority tax claims has been reduced to $3,007.91. This is a reduction of over 92% of the amount of the claims listed in the petition and of 91% of the amount of claims filed.

Based upon the amount and character of the estate's income and expenses during its first year, the substantial available loss carryovers of the debtor (tax attributes) and the fact that one creditor, Merril Lynch, was objecting to the debtor's discharge, MFC advised the trustee to select the longest possible initial fiscal year for the estate (July 31, 1992). This allowed the most effective utilization of the tax attributes to shield the income being generated by the estate. Since several of the estate's most valuable assets had very low tax basis, MFC continued to carefully monitor the income and expenses of the estate and work closely with the trustee so that he could maximize the sales value of these assets and minimize the tax impact before the end of the fiscal year in which the debtor's discharge order was entered. At the end of the fiscal year in which the debtor's discharge order was entered, all tax

attributes except administrative expense loss carryovers would be reduced to zero and any taxable gain on estate assets not sold by that time would not be shielded by these tax attributes. The trustee was successful in selling the estate assets with significant taxable gain at the highest possible value prior to July 31, 1994 and, with the exception of $827 of federal income tax paid for the fiscal year ended July 31, 1993, no federal income tax resulted from these sales. Through effective use of the administrative expense loss carryback provisions of the Internal Revenue Code, MFC prepared and the trustee filed an administrative expense loss carryback from the fiscal year ended July 31, 1994 to the fiscal year ended July 31, 1993, and the previously paid $827 of federal income tax was refunded with interest.

MFC advised the trustee to abandon three real estate limited partnership interests (burned out tax shelters) because they were a burden and of inconsequential value to the estate and because there was a risk that they could generate substantial "phantom income" not accompanied by a distribution of cash. In fact, one of these partnerships did report approximately $60,000 of phantom income after the trustee abandoned the interest and, as a result, significant federal income tax cost to the estate was avoided.

MFC advised the trustee to promptly request the § 505(b) tax clearance from the Internal Revenue Service ("Service") on federal income tax returns filed by the trustee during his administration. Such request has been made for the estate's fiscal years through July 31, 1995. The clearance has been received for fiscal years through July 31, 1994, without any income tax examination by the Service, and the clearance for July 31, 1995 is expected. Based upon MFC's review of the $72,097.64 proof of claim filed by the Service, it advised the trustee that, despite the Service's designation of $54,850.79 as secure, the Service had failed to file a Notice of Federal Tax Lien to perfect its security interest. Although the Court had already denied the Service's claim in full due to its failure to respond to the trustee's objection, MFC was able to obtain the agreement of the U.S. Attorney's Office, on behalf of the Service, to accept the denial of the Service's claim and to not petition the Court for a rehearing on this matter.

During the administration of this estate, the trustee, with the help of his attorney and MFC, has augmented the value of the estate by over $12,000 by his management of estate funds. Upon receipt of the initial sale proceeds of the Milan Duplexes, $151,818, and the By–Pass Property, $215,860, the trustee investigated alternative investments for those funds other than simply depositing them in an interest bearing bank checking account. When the funds were received, the trustee's bank's checking account interest rates were approximately 1.5% per annum. U.S. Treasury Bill interest rates were approximately 4.5%. The trustee arranged to invest the bulk of the estate's funds, about $270,000, in Treasury Bills. Over a year period the interest differential was approximately $8,100. Since moving the estate bank account to National Bank of Commerce ("NBC") in June, 1995, the trustee has kept virtually all estate funds invested in Certificates of Deposit ("CD") or Money Market Accounts ("MMA"), which pay 2 to 3 times checking account interest rates, and in Treasury Bills, which pay a rate about 1% higher than the highest CD or MMA rates. From May, 1994, through December, 1995, the anticipated date of closing this case, approximately 18 months, the trustee has obtained approximately $12,000 of additional interest income over bank checking account interest rates from careful management of estate funds. The trustee's attorney reviewed the Bankruptcy Code and conferred with the U.S. Trustee about the trustee's authority to invest the estate's funds as described above.

The trustee's attorney seeks enhancements of his fees in the amount of $17,500. The basis for the requested enhancement is three-fold. First, the trustee believes that his attorney and MFC have obtained extraordinarily good results in bringing assets into the estate and maximizing sales value. Of the matters set forth above, they specifically invite the Courts' attention to the lawsuit filed against the debtor, Bonnie Chary and Dr. Joglekar two years after the petition was filed. The suit to avoid a fraudulent convey-

ance required extensive knowledge and analysis of the financial and domestic affairs of the debtor and his wife, and a thorough understanding of bankruptcy, domestic relations and secured transactions law, and a creative application of each. The suit resulted in payments to the estate by Dr. Chary of $33,000, an amount greater than the amount of the requested enhancement.

Second, the trustee believes that his attorneys and MFC have obtained extraordinarily good results in reducing the allowed claims upon which the distribution to creditors will be based. The trustee's attorney and MFC eliminated the IRS' claim of $72,097. As set forth above, MFC saved the estate a significant amount of tax through careful tax planning and monitoring, resulting in no tax during the trustee's entire administration of the estate. MFC carefully monitored the amount and timing of estate ordinary income and capital gains, effectively utilized carryover tax attributes available to the estate, and ensured that trustee abandoned certain assets which could have had a significant negative tax impact on the estate. The only tax paid by the estate, $827.00, was later refunded with interest through an administrative expense loss carryback. This is particularly beneficial to general creditors, since prepetition tax claims avoided by MFC's efforts would have been priority claims and postpetition tax would have been an administrative expense. The trustee's attorney obtained an overall reduction in filed claims of over 90%. Of particular significance was the reduction of gambling debts from $1,700,000 to only $312,000. The elimination of $1,400,-000 of gambling debts has tripled the distribution to the remaining unsecured creditors.

Third, the trustee believes his attorney has done a superior job in managing all legal aspects of the case and assisting the trustee in managing estate funds. The management of estate funds by the trustee and his attorney as described above has added approximately $12,000 to the estate through increased interest income. This additional interest income, plus the $33,000 of proceeds from the fraudulent conveyance suit, have generated more than sufficient fund, $45,000, to "pay for" not only the requested enhance-ment, but also all other compensation and expenses requested herein. The trustee's attorney respectfully submits that the requested enhancement is justified.

The U.S. Trustee argues that the attorney for the case trustee is sufficiently compensated by the lodestar fees already approved and paid in this case and those lodestar fees for which approval is sought as part of the final fee request. The U.S. Trustee further argues that the services performed may have been excellent but were insufficient to justify the requested fee enhancement.

Although the parties have stipulated that the requested fees are not objected to by the U.S. Trustee, it is the obligation of the Court to find that the requested fees are both reasonable and necessary pursuant to 11 U.S.C. § 330(a). Often applicants and the U.S. Trustee forget this important requirement. In this instance the Court finds that the requested fees of the attorney for the case trustee, GWS, are reasonable and that the services performed were necessary to the administration of the Chapter 7 estate. In regard to the determination of whether an enhancement of an otherwise reasonable and necessary fee should be granted, this Court must look to existing case law for guidance.

The Court of Appeals for the Sixth Circuit applies the lodestar method in calculating fees awarded under § 330 of the Bankruptcy Code. *Boddy v. U.S. Bankruptcy Court*, 950 F.2d 334, 337 (6th Cir.1991). The lodestar approach is calculated by "multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended." *Boddy*, 950 F.2d at 337. The U.S. Trustee argues that in order to receive an enhanced fee the attorney for the case trustee must prove the lodestar fee calculation produced an unreasonably low fee and that an upward adjustment is necessary to render the fee reasonable. *Blum v. Stenson*, 465 U.S. 886, 898, 104 S.Ct. 1541, 1548–49, 79 L.Ed.2d 891 (1984). GWS argues that the *Boddy* Court acknowledged that once a fee had been determined by the lodestar formula, the Bankruptcy Court may "consider other factors such as the novelty and difficulty of the issues, the special skills of counsel, the results obtained, and whether the fee awarded

is commensurate with fees for similar professional services in non-bankruptcy cases in the local area." *Boddy,* 950 F.2d at 338. This Court has found no case where the Supreme Court has addressed fee enhancements in bankruptcy matters.

This Court notes that in all the cases cited by both parties, the decisions turned on the particular facts of each case. This Court agrees with the finding of Judge Leif M. Clark in the *In re Farah* decision, 141 B.R. 920 (Bankr.W.D.Tex.1992), holding that there are no uniform standards by which to arrive at fee enhancement awards. In the instant case, the U.S. Trustee agrees that the services performed by counsel for the trustee were excellent. The sole contention of the U.S. Trustee in its objection to the requested enhancement is that the results, although excellent, are not sufficient to justify the requested enhancement.

The attorney for the trustee, along with his financial advisor, produced excellent results. A case that was at first believed to be either a no asset case or one with very few assets has been transformed into a case that will pay approximately forty (40%) percent to creditors. There is no dispute that this is the direct result of prompt and aggressive work by counsel for the trustee. The U.S. Trustee argues that there were not many adversary proceedings or litigated objections to claims in the instant case. This appears to be the direct result of the prompt and aggressive stance of counsel for the trustee, especially in eliminating some $1,400,000 of claims related to gambling debts of the debtor. It is further undisputed that the prompt employment of the financial advisor MFC resulted in substantial tax savings to the estate.

This Court concludes that the size of the case is only one factor in determining whether an enhancement of a fee should be granted. Many large cases do not require the promptness of action that smaller cases require. In the instant case, the Court is persuaded that the critical consideration for the Court is the result obtained. There is no dispute the results were excellent.

For the foregoing reasons the Court grants the requested fee enhancement of "GWS" in the amount of $17,500.

Counsel for trustee shall prepare an order consistent with this opinion.