In re **MIRANT CORPORATION,** et al., Debtors.

No. 03–46590 DML–11.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Nov. 21, 2006.

Allison Kirschner, Bryan A. Merryman, Charles C. Kline, Claudine Columbres, Daniel Ginsberg, Erika Ruiz, Erin L. Connolly, Felix J. Lopez, Forrest W. Hunter, Frank L. Eaton, Gerard Uzzi, Glenn Kurtz, Jack E. Pace, III, Jason D, Schauer, Jennifer M. Driscoll, Kathleen Pakenham, Linda M. Leali, Maria K. Pum, Robert A. Milne, Robert P. Sweeter, Scott A. Griffin, Stephen J. Vitola, Susan K. Chandler, Thomas E. Lauria, Timothy V. Mulvey, Tristram J. Mallett, Wayne A. Cross, White & Case LLP, Miami, FL; Alison S. Talbert, Eric N. Macey, Stephen J. Siegel, Novack and Macey LLP; Amy M. Walters, Frances Anne Smith, Jason B. Binford, Judith Elkin, Mark Joseph Elmore, Robin Eric Phelan, Haynes & Boone LLP, Dallas, TX; Benjamin D. Singer, Douglas P. Baumstein, Heather K. McDevitt, Howard S. Beltzer, Kara F. Headley, Melonie Jurgens, Paul B. Carberry, Thomas M. Biesty, Vincent R. FitzPatrick, Jr., White & Case, New York City; Brian K. Fielden, Alston & Bird, Atlanta, GA; Craig H. Averch, Kerri A. Lyman, Ronald Kevin Gorsich, White & Case, LLP, Los Angeles, CA; Dan Woods; Daniel A. Mullen, McDermott Will & Emery LLP, Chicago, IL; Elliot D Schuler, Baker and McKenzie, Dallas, TX; G. Larry Engel, White & Case, LLP, San Francisco, CA; Ian T. Peck, John David Penn, Haynes & Boone, LLP, Fort Worth, TX; J. Robert Forshey, Forshey & Prostok, LLP, Fort Worth, TX; Jeff P. Prostok, Forshey and Prostok, Ft. Worth, TX, John H. Sturc, Gibson, Dunn & Crutcher, Washington, DC; Kristina R. Juntunen; Maja Fabula; Michele C. Campbell, White & Case, Los Angeles, CA; Paul E. Godinez; Richard L. Miller, II, Novack and Macey; William H. Hughes, Jr., Alston & Bird LLP, Atlanta, GA, for Mirant Corporation, aka Southern Energy, Inc., aka SEI Holdings, Inc., Atlanta, GA, Debtor in Possession.

Marie Schmidt, William T. Neary, United States Trustee, Dallas, TX; George McElreath, Office of the United States Trustee, Dallas, TX, for UST U.S. Trustee, Dallas, TX.

Gregory M. Petrick, Cadwalader, Wickersham & Taft, New York City, Thomas Rice, Cox & Smith, San Antonio, TX, for MAGI Committee, Creditor Committee.

Andrew S. Dash, Danielle Bennett, Jeffrey L. Jonas, John P. Biedermann, Leslie

Scharf, Robert L. Harris, Brown Rudnick Berlack Israels LLP, New York City, Brandan C. Recupero, William R. Baldiga, Brown Rudnick Berlack Israels LLP, Boston, MA, Eric J. Taube, Mark Taylor, Hohmann, Taube & Summers, LLP, Austin, TX., for Officials Committee of Equity Security Holders, Hohmann, Taube & Summers, LLP, Austin, TX, Creditor Committee.

## MEMORANDUM OPINION

DENNIS MICHAEL LYNN, Bankruptcy Judge.

The court today must rule on the compensation of professionals in these cases. Before the court are the final applications for compensation and reimbursement of expenses (each an "Application" made by an "Applicant") filed on behalf of professionals retained by Debtors, the Official Creditors' Committee for Mirant Corporation ("Mirant" and the "Corp Committee"), the Official Creditors' Committee for Mirant Americas Generation, LLC ("MAG" and the "MAG Committee"), the Official Committee of Equity Owners for Mirant Corporation (the "Equity Committee" and, together with the Corp Committee and the MAG Committee, the "Committees"), and the Examiner, as well as the Application filed by the Examiner on behalf of himself and his firm. Also pending are Applications filed pursuant section 503(b) of the Bankruptcy Code (the "Code")[1] by Phoenix Partners, LP, Phoenix Partners, III, LP and Phoenix International (BVI) Ltd.

(collectively "Phoenix"), the unofficial committee of MAG noteholders (the "MAG ad hoc Committee"), the unofficial committee of Mirant bondholders (the "Corp ad hoc Committee"), certain Mirant convenience class creditors identified below (the "Convenience Creditors") and Matt Wilson, on behalf of himself and other shareholders ("Wilson").

Finally, the court must consider enhancement requests pursuant to the *"Motion of Mirant Corporation and Affiliated Debtors, the Official Committee of Unsecured Creditors of Mirant Corporation, the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC and Counsel for Each of the Foregoing for a Fee Enhancement and Joint Reply to Response of the Official Committee of Equity Security Holders to the Statements of Positions with Respect to the Payment of Fee Enhancements in these Cases,"* (the "Pool Motion") and the *"Application of Brown Rudnick Berlack Israels LLP and Hohmann, Taube & Summers, L.L.P. at Request of Official Committee of Equity Security Holders for Bonus Fee Enhancement To Be Awarded Pursuant to 11 U.S.C. § 330(A) [sic]"* (the "Bonus Application"), and a request by the Examiner and his counsel for fee enhancements.[2]

The court received testimony, documentary evidence and argument concerning the Applications in hearings conducted June 5–7, 12, 13, and 16, 2006 (the "Hearing").[3] Evidence considered by the court

---

**1.** 11 U.S.C. §§ 101, *et seq.* Because the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), which is largely not effective with respect to these Debtors, did not make any substantive change to the Code that would affect the analysis or outcome in this memorandum opinion, citations will refer to sections as numbered following passage of BAPCPA. Where appropriate, the

court will indicate changes in language or numbering made by BAPCPA.

**2.** A list of all Applications, and the amounts requested (excluding, in some cases, requests for fee enhancements), considered by the court is provided in Appendix A to this memorandum opinion.

**3.** Because confirmation of a plan has not occurred for certain Debtors providing power in

will be identified when appropriate below. Various parties have filed briefs in support of or opposed to certain of the Applications. Because the court must consider the entire course of these cases to dispose of the Applications, the court here incorporates the entire record of these cases (and their spawn of adversary proceedings) since their commencement.[4]

The Applications are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2). This memorandum opinion comprises the court's findings of fact and conclusions of law respecting the Applications, the Bonus Application, the Pool Motion, and the Examiner's enhancement request. Fed. R. Bankr.P. 9014 and 7052.

## I. Background

### A. Introduction

Beginning on July 14, 2003, these chapter 11 cases were filed at various times by 84 Debtors.[5] On July 25, 2003, the United States Trustee (the "UST") appointed the MAG Committee and the Corp Committee. On September 18, 2003, the UST appointed the Equity Committee. On April 7, 2004, the court directed appointment of an examiner and, on April 13, 2004, approved the UST's selection of William Snyder as the Examiner.

In late 2004, the Committees, Debtors and the court determined that assessment of the worth of Debtors' enterprise through a valuation hearing was a neces-sary step to establish whether Mirant's stockholders were entitled to participate in Debtors' reorganization. The Debtors filed the first version of the Plan on January 19, 2005, and a second version on March 25, 2005. The court commenced the hearing on valuation on April 18, 2005 (the "Valuation Hearing"). In addition to Debtors and the Committees, Phoenix and Wilson actively participated in the Valuation Hearing.

Following the Valuation Hearing the court issued two letter rulings on June 30 and July 26, 2005 (the "Letter Rulings"), in which it directed Curt Morgan, Mirant's Executive Vice President ("Morgan"), together with Tim Coleman, a representative of Blackstone Group ("Blackstone" and "Coleman"), and the Examiner to recalculate Debtors' total enterprise value ("TEV") based on certain changes to the models used by Debtors and Blackstone to determine, respectively, the cash flow of Debtors' enterprise and Debtors' TEV. The court also directed the Examiner to explore the possibility of a plan consensual among the parties.

As a result of negotiations among Debtors, the Committees, the MAG ad hoc Committee, the Corp ad hoc Committee and Phoenix, a term sheet for a consensual version of the Plan was signed on September 8, 2005, and recalculation of Debtors' TEV ceased at that time at the court's direction. The Plan in its final form resulted, and confirmation occurred on De-

New York state, (the "New York Debtors"), the court deferred rendering a decision on the Applications, which are intended to be "final," in order to have a better idea of the outcome of the cases of the New York Debtors.

4. In contested matters, it is appropriate for the court to look to the entire record of the case. *See Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs. Ltd.)*, 61 F.3d 197, 203 (3d Cir.1995); *cf. In re Alexan-*der, 284 B.R. 626, 629 (Bankr.N.D.Ohio 2002).

5. The 84th case was filed by a shell entity (Newco 2005 Corporation) solely to facilitate confirmation of Debtors' plan of reorganization (the court hereafter uses the defined term "Plan" to include the several iterations filed by Debtors; as necessary, the court will identify specific versions of the Plan by date).

cember 9, 2005.[6] Of the parties whose professional fees are now at issue, only Wilson opposed confirmation of the Plan.

## B. Factual Background

The factual context of these cases has been fully described in numerous prior opinions.[7] Suffice it to say at this point that Debtors' administratively consolidated chapter 11 cases rank among the largest bankruptcy proceedings in American history. To the court's knowledge, Debtors' cases are the largest ever to provide 100% satisfaction to all creditors and a substantial return (property worth roughly $1.50 per share as of the Plan's effective date) to public shareholders.

Debtors' chapter 11 cases are complicated on a series of levels. Debtors' business is complex. As an energy merchant active in a number of market-places, both nationally and internationally, Debtors generate and dispatch power and provide electric capacity through a complex, regulated market mechanism.[8] Debtors also have actively traded in the commodities market. Though principally concerned with purchase and sale of commodities critical to their core business such as fuels, power and emission credits, Debtors, through Mirant Americas Energy Marketing, LP ("MAEM"), in the past bought and sold other commodities such as newsprint for profit.[9]

---

**6.** The Plan carved out the New York Debtors, and their cases have continued pending disposition of certain ad valorem tax issues by the Supreme Court of the State of New York. That Court ruled on the tax issues earlier this year, and its decisions have been appealed.

**7.** The published opinions include: *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 197 Fed.Appx. 285 (5th Cir.2006); *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238 (5th Cir.2006); *Official Comm. of Unsecured Creditors of Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511 (5th Cir.2004); *MC Asset Recovery, LLC v. Southern Co.*, 339 B.R. 380 (N.D.Tex.2006); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107 (N.D.Tex.2006); *Sacramento Mun. Util. Dist. v. Mirant Americas Energy Mktg. LP (In re Mirant Corp.)*, 331 B.R. 693 (N.D.Tex.2005); *In re Mirant Corp.*, 318 B.R. 100 (N.D.Tex.2004); *Official Comm. of Unsecured Creditors of Mirant Americas Generation, L.L.C. v. Mirant Corp. (In re Mirant Corp.)*, No. 4–04–CV–476–A, 4–04–CV–530–A, 52 Collier Bankr.Cas.2d 1774, 2004 WL 2250986 (N.D.Tex. Sept. 30, 2004); *In re Mirant Corp.*, 303 B.R. 304 (N.D.Tex.2003); *In re Mirant Corp.*, 348 B.R. 725 (Bankr. N.D.Tex.2006); *In re Mirant Corp.*, 348 B.R. 720 (Bankr.N.D.Tex.2006); *In re Mirant Corp.*, 334 B.R. 800 (Bankr.N.D.Tex.2006); *In re Mirant Corp.*, 332 B.R. 139 (Bankr. N.D.Tex.2005); *Official Comm. of Unsecured Creditors of Mirant Corp. v. Southern Co. (In re*

*Mirant Corp.)*, Adv. No. 05–04099, 54 Collier Bankr.Cas.2d 1361, 2005 WL 2265446 (Bankr.N.D.Tex. Aug. 31, 2005); *In re Mirant Corp.*, 326 B.R. 646 (Bankr.N.D.Tex.2005); *In re Mirant Corp.*, 326 B.R. 354 (Bankr. N.D.Tex.2005); *Mirant Mid–Atlantic, LLC v. Morgantown OL1 LLC (In re Mirant Corp.)*, 327 B.R. 262 (Bankr.N.D.Tex.2005); *In re Craft*, 321 B.R. 189 (Bankr.N.D.Tex.2005); *In re Mirant Corp.*, 316 B.R. 234 (Bankr. N.D.Tex.2004); *In re Mirant Corp.*, 314 B.R. 347 (Bankr.N.D.Tex.2004); *Sacramento Mun. Util. Dist. v. Mirant Americas Energy Mktg. LP (In re Mirant Corp.)*, 318 B.R. 377 (Bankr. N.D.Tex.2004); *Mirant Americas Energy Mktg. LP v. City of Vernon (In re Mirant Corp.)*, 319 B.R. 489 (Bankr.N.D.Tex.2004); *Mirant Americas Energy Mktg. LP v. Kern Oil & Refining Co. (In re Mirant Corp.)*, 310 B.R. 548 (Bankr.N.D.Tex.2004); *In re Mirant Corp.*, 303 B.R. 319 (Bankr.N.D.Tex.2003); *Mirant Corp. v. Potomac Elec. Power (In re Mirant Corp.)*, 299 B.R. 152 (Bankr.N.D.Tex.2003); *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D.Tex.2003). A number of appeals remain *sub judice* in the District Court and the Court of Appeals.

**8.** For a discussion of Debtors' sales of power and compensation for capacity, *see In re Mirant Corp.*, 334 B.R. 800, 804–05 (Bankr. N.D.Tex.2005).

**9.** *See In re Mirant Corp.*, 314 B.R. 347 (Bankr. N.D.Tex.2004).

Debtors are subject to regulation by, *inter alia,* the Federal Energy Regulatory Commission ("FERC"), state power authorities, federal and state environmental agencies, various independent system operators [10] and government agencies in the Philippines and Caribbean. Owning numerous power plants, the Debtors or their affiliates are obligated to taxing authorities in more than a dozen states and several countries.

Debtors' corporate structure is best described as Byzantine. Debtors' business has been sliced and diced in a fashion hardly rational.[11] Significant financing existed at, *inter alia,* the Mirant, Mirant Americas, Inc., MAG, Mirant Mid–Atlantic, LLC ("MIRMA"), MAEM, and foreign subsidiary levels.[12] Unraveling intercompany claims and guaranties required thousands of hours of work by professionals of, *inter alia,* Debtors, the MAG Committee and the Corp Committee as well as considerable effort by the Examiner.

These facts have not only complicated the task of restructuring Debtors; they have added to the complexity of issues that had to be addressed by the parties and the courts. Issues of first impression, such as the proper construction of the definition of "forward contract merchant" and construction of sections 556, 559 and 560 of the Code, have been mixed with questions rarely addressed by Courts such as the discount rate for determining contract rejection claims, the applicability under Code § 365(e) of the federal Anti–Assignment Act, and the interplay between Code §§ 105(a) and 362(b)(4). Other issues presented by these cases, such as recharacterization of leases as debt, court control over solicitation of votes for or against the Plan, the innuendos of impairment, the means of dealing with critical vendors, the permissible role for an examiner and the proper standards for withdrawal of the reference have been the subject of considerable but conflicting precedent and thus required thorough and careful study. Dealing with these legal questions has challenged the parties and the court and has led to the substantial body of jurisprudence recorded above as well as numerous compromises and unreported court decisions.

As of the end of May 2006, the court had expended approximately 700 hours of courtroom time on these cases and the adversary proceedings and issues spawned by them. Almost 15,000 pleadings have been filed in this court in these cases—not counting pleadings in adversaries. Moreover, in these cases and related matters Debtors have commanded the attention and required significant time from, *inter alia,* the Fifth Circuit Court of Appeals, the United States District Court for the Northern District of Texas, Canadian bankruptcy courts, FERC, the Supreme Court of New York, the United States District Court for the Northern District of Georgia, and various other state courts and regulatory bodies.[13]

**10.** Independent system operators oversee and administer regional power markets. *See In re Mirant Corp.,* 334 B.R. at 805 n. 5.

**11.** For example, Debtors' Chalk Point Facility was owned and operated in different parts by different entities that are themselves subsidiaries of entities widely separated on Debtors' organizational chart. *See In re Mirant Corp.,* No. 03–46590, 2005 WL 2148362 (Bankr. N.D.Tex. Jan. 26, 2005); *In re Mirant Corp.,*

No. 03–46590, 2006 WL 2383343 (Bankr. N.D.Tex. Aug. 9, 2006).

**12.** The court here uses the term "financing" to include arrangements like those between MIRMA and the MIRMA landlords described *In re Mirant Corp.,* 327 B.R. 262 (Bankr. N.D.Tex.2005).

**13.** The court takes this opportunity to gratefully acknowledge time-consuming mediation efforts in specific disputes by four colleagues:

## C. The Fees Sought

Fees sought in these chapter 11 cases through Applications before the court total $420,182,596.24.[14] In addition, pursuant to authority granted by an order of the court entered August 1, 2003, the Debtors have employed a number of "ordinary course professionals." According to the Debtors' records, the Debtors have paid these ordinary course professionals approximately $11 million during the course of these chapter 11 cases.

The fees now sought may be divided into four general classes: (1) compensation and reimbursement sought pursuant to Code § 330 by professionals employed by statutory fiduciaries (Debtors, the Committees, and the Examiner); (2) "success fees" sought by financial advisors employed by Debtors and the Committees; (3) Applications for compensation of professionals and reimbursement pursuant to Code § 503(b)(3) and (4); and (4) bonuses or fee enhancements sought by certain professionals.

### 1. The Fees in Perspective

The court recognizes that the magnitude of the total of fees sought in these cases may raise questions about the cost of the chapter 11 process. Although the court later criticizes (and in fact denies) some of the fees sought, the court is *not* offended by the mere total of costs. In the first place according to testimony at the Hearing at least one third of the total sought by the Applications did not result from the chapter 11 process. Rather, Debtors incurred these costs for ordinarily required professional services (*e.g.*, audits) or in dealing with problems that required the rendered services independently of the chapter 11 relief sought.[15] Second, the effects of these chapter 11 cases include elimination of numerous disadvantageous contracts of Debtors,[16] conversion of billions of dollars of debt into equity and other improvements on Debtors' balance sheet and cash flows. Third, the costs incurred by Debtors, taking the foregoing into account, are not unreasonable in light of professional fees incurred by other large enterprises.

Finally, during these cases, the attorneys, at least, have constantly worked un-

Judges Robert Jones, Harlin Hale, Russell Nelms and Steven Felsenthal.

14. This total includes all requests for fee enhancements and also includes Applications filed by Deloitte & Touche LLP (or its affiliates) totaling $30,771,858.43. These Applications were considered by Hon. Russell F. Nelms due to the need for the undersigned to disqualify himself as to the Applications of Deloitte & Touche LLP pursuant to Fed. R. Bankr.P. 5004(b). Judge Nelms' ruling respecting fees and expenses of Deloitte & Touche LLP is by separate order.

15. For example, negotiation and implementation of the California Settlement (as defined in ¶ 19 of Exhibit A to the Plan) and resolution of claims such as those asserted by Joseph Pokalsky or contractors owed for work on the Kendall Facility in Massachusetts would have been necessary whether or not Debtors were in chapter 11. If anything, the chapter 11 cases brought greater efficiency to the litigation necessary to dispose of such matters.

16. For example, Debtors rejected and so monetized their obligations under the Tolling Agreement with Perryville Energy Partners, LLC (*cf. In re Mirant Corp.*, 316 B.R. 234 (Bankr.N.D.Tex.2004)) and the Precedent Agreement for Firm Transaction Service with Kern River Gas Transmission Company. (*see In re Mirant Corp.*, 332 B.R. 139 (Bankr. N.D.Tex.2005)). In total, the Debtors reviewed over 13,000 contracts and unexpired leases. Through the rejection process, the Debtors eliminated over $500 million in future obligations. *See* Application of White & Case LLP, Exhibit G (Summary of Services) ¶ 220 (Docket No. 13400).

der enormous pressure.[17] Not only did the necessity for quick action in some circumstances (*e.g.*, preservation of MAEM's trading business in light of the Code's special protection of commodity contracts) require counsel to work long, often unreasonable hours, but the court, consistent with its duty to press Debtors to reorganize as promptly as possible,[18] has constantly maintained pressure on the parties. The claims adjudication process required lawyers to work throughout the 2004 holiday season; this was followed by the forced march to valuation, and then another holiday season marred by a plan process leading to a January 3, 2006, effective date. In other disciplines ruined holidays and long, working nights would lead to extra charges. For the attorneys in these cases, there was no reasonably sure reward beyond the expectation of payment of lodestar fees.

### 2. Mechanism for Dealing With Fees

Due to the complexity of these cases, the large number of professionals involved and the consequent importance of an efficient mechanism for dealing with compensation, the court entered various orders regarding interim and final allowance of professional fees. Those orders include:

(1) *"Administrative Order Establishing Procedures For Interim Compensation and Reimbursement of Chapter 11 Professionals and Committee Members,"*

(the "Procedures Order") entered on August 1, 2003;

(2) *"Memorandum Order Regarding Compensation of Professionals,"* ("Compensation of Professionals Order") entered on August 27, 2003;

(3) *"Order Regarding Compensation of Fee Expert and Fee Review Committee Chairperson Nancy B. Rapoport"* and its *"Order Regarding Fee Review Committee Procedures and Standards,"* entered on November 6, 2003; and

(4) *"Memorandum Order Consolidating Certain Professional Fee Orders,"* entered on January 22, 2004.

In its Compensation of Professionals Order, the court established a fee review committee (the "FRC") to review fees in these cases and appointed Nancy B. Rapoport of the University of Houston School of Law as the court's expert on compensation matters and as chairperson of the FRC. The Committees, Debtors and the UST were represented on the FRC (as was Phoenix in the last months before confirmation of the Plan). The FRC regularly reviewed fee statements of professionals. The orders referenced above provided a mechanism for the FRC or any other party having an objection to any fee statement to bring the objection before the court. The FRC has also reviewed all of the Applications and made recommendations to the court regarding allowance and disallowance of fees and expenses of the

---

**17.** The court recognizes and appreciates that this pressure was borne by Debtors' personnel as well.

**18.** *See In re Timbers of Inwood Forest Assoc., Ltd.,* 808 F.2d 363, 370 (5th Cir.1987), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (observing that "it is the role of the courts to effectuate those provisions of the Bankruptcy Code that Congress has already enacted to protect creditors and to reduce delay"); *Public Serv. Co. v. State of New*

*Hampshire (In re Public Serv. Co.),* 108 B.R. 854, 891 (Bankr.D.N.H.1989) (opining that Congress, like any experienced bankruptcy professional, recognizes that "reasonable 'promptness' in resolving a corporate reorganization under chapter 11 is important"); *cf. In re Cassavaugh,* 44 B.R. 726 (Bankr. W.D.Mo.1984) (dismissing a Chapter 11 petition under § 1112(b)(2) because the debtors had failed to present an acceptable plan within eight months of the petition).

various professionals in these chapter 11 cases.

## II. Discussion of Applications

As indicated above, for purpose of analysis, the Applications may be divided into four categories. Because of their number, the court does not address every Application below. Rather, the court discusses each of the four categories below. As appropriate, the court first considers generally applicable law and the standard it must apply in ruling on Applications within the category. Then, as necessary, the court considers individual Applications within the category.

## III. Applications Under Section 330

■ Each of the Applications pursuant to Code § 330 (except to the extent specifically dealt with in subsequent sections of this memorandum opinion) will be GRANTED as prayed for. Applications in this category are designated by an asterisk in Appendix A.

In the first place, no objection has been lodged to any of these Applications.[19] They are supported by the final report of the FRC.[20] The fees and expenses of these professionals have been vetted by the UST and the FRC (and have been subject to review by the principal interested parties in these cases) since the commencement of these cases. The FRC has persuaded professionals to trim approximately $1 million from fees and expenses which are the subject of these Applications.[21]

Second, these cases have been stunningly successful (as discussed to some extent above). Claims of creditors including subordinated creditors, have been satisfied in full,[22] and holders of common stock of Debtor Mirant have received a meaningful return on their interests.[23] While the market for electric power and related commodities markets have certainly played the lead role in producing this success,[24] that the allocation of consideration has so closely approximated the just result contemplated by the Code[25] is a credit to the

19. Notice of the fees sought by these professionals was regularly given to, *inter alia*, the UST, the Debtors, counsel for the Debtors, the FRC, the Corp Committee, the MAG Committee, the Equity Committee, the Examiner, and counsel for the Examiner.

20. *See* Fourth Amended Final Fee Review Report of the Fee Review Committee (Docket No. 14107).

21. *See* Third Amended Final Fee Review Report of the Fee Review Committee, Attachment C (Docket No. 14090).

22. *See In re Mirant Corp.*, 334 B.R. 800, 832 n. 112 (Bankr.N.D.Tex.2005); *see also In re Mirant Corp.*, 348 B.R. 725 (Bankr.N.D.Tex. 2006).

23. According to the Application of Peter J. Solomon Company, L.P. (Docket No. 13366), at the time the parties agreed to the term sheet on which the Plan was based, primary equity and warrants were calculated to be worth approximately $1.45 per share and as

of February 2006, were valued in the market at $1.58 per share.

24. The very effective exploitation of market conditions by Debtors' management, under the direction, the court understands, of Morgan, deserves much credit as well.

25. Chapter 11 is intended to provide value in a waterfall fashion; absent their consent, senior creditors must be fully satisfied before junior creditors or equity is entitled to any return. Code § 1129(b)(1); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). On the other hand, senior debt is not to be overcompensated (*i.e.*, senior debt ought not to receive money or property having a value in excess of its claims including interest). *See* 7 Collier on Bankruptcy ¶ 1129.04[4][a][ii] (15th ed. rev.2004).

In the case at bar, the most junior debt traded at almost par plus interest on the effective date of the Plan. The property distributed in satisfaction of that debt under the Plan soon

professionals engaged in these cases and particularly those dealt with in this section of this opinion. While some of the concerns expressed below in section VI of this memorandum opinion, addressing bonuses, might require a reduction in lodestar fees in a case in which the results were not so good—or in which the purposes of the Code were not so well served—here the results achieved by the professionals merit payment of professionals in full in satisfaction of their reasonable expectation that, if they provide competent services generally efficiently, they are entitled to lodestar compensation.

Finally, the court has reviewed each of the Applications in this category, the declarations in their support and the evidence presented at the Hearing. In many in-stances the court has observed the performance of the Applicant firsthand and in most cases the court is at least generally familiar with the tasks the Applicant performed and the quality and results of the work done. The court finds that each of the Applicants has satisfied the requirements of Code § 330,[26] the UST's guidelines [27] and the standards for compensation established by case law [28] and therefore these Applications warrant granting.

## IV. Financial Advisor Success Fee Applications

The financial advisors to the statutory fiduciaries that are seeking success fees may be divided into two categories. The first consists only of AP Services, LLP ("AP"), which provided crisis manager services to the Debtors. The second category

---

exceeded in value the claims for which it was issued. Thus, these cases neither left creditors unsatisfied nor significantly overcompensated them.

It is the view of the court that it is a duty of the statutory fiduciaries in a chapter 11 case to pursue a result that is consistent with the general intent of chapter 11, that is one that approximates this fair and equitable standard. *See In re Combustion Eng'g*, 391 F.3d 190, 241–42 (3d Cir.2004); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 167 (D.N.J.2005). The faithful performance of this duty depends upon each fiduciary's professionals, who should be advising their client in a fashion consistent with just allocation of value and consistently with the "fair and equitable" standard set by the Code. In the case at bar, the effect of the work of professionals is praiseworthily consistent with the ultimate performance by their principals of their fiduciary duties.

**26.** 11 U.S.C.A. § 330(a)(3):

In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
 (A) the time spent on such services;
 (B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
 (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
 (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
 (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

**27.** *See* United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330.

**28.** *See In re Cahill*, 428 F.3d 536, 539–40 (5th Cir.2005) (citing *In re Fender*, 12 F.3d 480, 487 (5th Cir.1994)) (holding that "[t]he Lodestar method of calculating fees builds on the *Johnson* factors and is traditionally used by the Fifth Circuit"); *First Colonial Corp. of Am.*, 544 F.2d 1291 (5th Cir.1977); *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974).

includes investment banking firms that advised the statutory fiduciaries on reorganization options, plan structure and similar issues and that provided expert testimony on value.

## A. AP

AP seeks approval of total fees of $21,702,235 and expenses of $1,667,513.29 plus a success fee of $4,000,000. The court understands the success fee applied for to have been negotiated with the Debtors. The court also understands no party has objected to granting AP's Application.

AP was retained pursuant to Code § 363 because part of its role was to provide Debtors with a chief restructuring officer.[29] Nevertheless, AP has complied with the same procedures antecedent to payment as have other professionals.

■ The court has had concern about the quality of services performed by AP. The persons assigned the role of chief restructuring officer do not appear to have performed as Debtors hoped. Also, information flow problems that initially plagued these cases eventually required intervention by the Examiner, despite assurances to the court that these problems would be fully addressed by AP.

However, the court will GRANT AP's Application. Though the role performed by AP was not the same as that of the other financial advisors, the court is not prepared to grant the Applications of Blackstone and Houlihan Lokey Howard & Zukin ("Houlihan") and not grant that of AP.

## B. Other Financial Advisors

■ The Applications of the other financial advisors for success fees will be GRANTED [30] as follows:

| The Blackstone Group, L.P. | $7,000,000 |
| Miller Buckfire & Co., LLC | $2,500,000 |
| Houlihan Lokey Howard & Zukin | $8,814,924 |
| Peter J. Solomon Company | $3,200,000 |

These Applications are made pursuant to Code § 328. Under controlling precedent in this circuit, the court has little discretion whether to grant payment of the success fees. *In re Barron*, 325 F.3d 690 (5th Cir.2003), *In re Texas Sec., Inc.*, 218 F.3d 443 (5th Cir.2000). Under the agreements reached by the financial advisors with their clients, each financial advisor was entitled to a monthly fee (which has been paid on a regular basis) as well as expenses. Each financial advisor also negotiated a "success fee," to be paid in the event of a successful end to the Debtors' cases. Not surprisingly, "success" (usually referred to by the Applicant as "restructuring" or a "transaction") is defined broadly by the financial advisors.[31] Only

---

**29.** The UST and other parties acquiesced in this method of retention (which was intended to avoid application to AP of the disinterestedness test of 11 U.S.C. § 101(14) due to AP's personnel serving as officers of Debtors). The court is not satisfied that use of Code § 363 is appropriate for such a purpose, but need not here reach that issue.

**30.** To the extent any financial advisor is owed any remaining monthly fees or expenses, such amounts are also approved for payment. Such amounts are included in the totals provided in Appendix A.

**31.** Blackstone's negotiated "restructuring fee" was payable "upon consummation of a

plan of reorganization of [Mirant] or any of its subsidiaries." *See* Letter of July 14, 2003, from Blackstone to Edwin H. Adams, Mirant's Senior Vice President. Miller Buckfire & Co., LLC's, (hereafter "MBY") fee was due upon the closing of any "Restructuring," a term broadly defined to include confirmation of a plan or "any recapitalization or restructuring" of the Debtors' equity or debt. *See* Letter of August 5, 2003, from MBY to the Corp Committee. Houlihan's "Transaction Fee" was to be calculated by a formula based upon return to MAG creditors. *See* Letter of July 25, 2003, from Houlihan to the MAG Committee.

by implication is there any intent to tie a successful result in the case to the financial advisor's work, and in the case at bar, in which liquidation in chapter 7 was not a realistic possibility, some sort of "success" was inevitable. As counsel for Houlihan advised the court during the Hearing, even had his client done no work whatsoever to earn its fees, it would be entitled to the success fee for which it negotiated.

The court erred seriously in entering orders which left it so little discretion in assessing the work of the financial advisors. Though the court was given to understand Debtors and the Committees could not obtain competent financial advisors without assurance that there would be substantial "success" bonuses, whether or not each advisor could show it had earned such a fee, the court has since learned that some financial advisors, at least, will accept more conventional arrangements in terms of compensation.[32] In the future, the court hopes and expects that parties in

large chapter 11 cases in this and other districts will seek out financial advisors that are willing to have their work judged on a basis similar to the rules applied to other professionals.[33]

If the Applicants in this category were seeking compensation under section 330 of the Code, the court suspects the awards could be justified on the same grounds as is payment of other professionals.[34] Perhaps because of the nature of fee arrangements for structuring transactions outside of bankruptcy,[35] however, many financial advisors insist in a chapter 11 case on tying their compensation to a "successful" outcome of the case. This, in turn, suggests that the efforts of a financial advisor should be measured, if not in lodestar fashion, then by the contributions of the advisor to the successful outcome of the case. Logically, this means a financial advisor's compensation should be based on the advisor's part in bringing about a successful

---

32. During the Hearing, Mr. Siegert of Houlihan testified that he discovered that, in at least two cases of comparable size and complexity as these cases, financial advisors were employed under Code § 330. In the UAL Corp. case, Mesirow Financial Consulting represented the Official Committee of Unsecured Creditors and in Kmart Corp., KPMG LLC represented the Official Committee of Unsecured Creditors. *See* Houlihan Exhibit, Tab 7.

33. The court notes that Peter J. Solomon comes before the court acknowledging that the court must assess its entitlement and quantify its success fee accordingly. As Peter J. Solomon (despite the problems with its valuation report; *see In re Mirant Corp.*, 334 B.R. at 814) came closest of the financial advisors to the correct valuation of Debtors' TEV, the court is pleased to award Peter J. Solomon its success fee, which the court considers it has earned.

34. The court understood financial advisor professionals do not ordinarily keep records of time spent. In the case at bar several

advisors (*e.g.* MBY) did maintain time records.

35. Outside of bankruptcy, there are less likely to be different advisors pressing potentially inconsistent strategies for the same company. In chapter 11, if the advisors have differing views, not all will actually play a role in the "success" of the case. Were compensation calculated on a lodestar basis, this would not matter; a fee dependent on success, on the other hand, where fees are not calculated based on actual effort expended, should be more in the nature of a contingency. If the court cannot inquire into the professional's work, payment of the "success" fee should be contingent upon the professional being the agent of that success. The insistence of financial advisors that they be freed of both that contingency and the limitations of a lodestar calculation means the court is unable to protect against the incurrence of costs for which concomitant value is not received. This is contrary to the most basic axiom of bankruptcy law—that estates of bankrupt debtors should not be diminished absent receipt of comparable value.

result. Certainly in the case at bar this court cannot find that the Debtors' estate and its constituencies received direct benefit commensurate with the fees now to be paid to some of the financial advisors.

In the case at bar, the Plan represents a logical structure for achieving a just result for all of Debtors' stakeholders. The structure itself is not complex; the design is to ensure full, but no more than full, recovery to senior creditors, then junior creditors and, if value remains, to equity.[36] This design for restructuring did not require the input of high-priced financial advisors and did not represent a transaction identified or managed through their peculiar expertise.

However, the success of the Plan in achieving a just result turned on valuation of the Debtors. If overvalued, creditors might have been short-changed; if undervalued, equity would have been unfairly penalized.

Because the valuation of Debtors turned in large part on the court's assessment of value testimony by the financial advisors, it is that testimony which, in fact, is the best measure of their contribution in these chapter 11 cases. The court has previously noted that the financial advisors, in opining on value, took into account the benefit to their employing constituency of a more or less conservative approach to value. *See In re Mirant Corp.*, 334 B.R. 800, 814 (Bankr.N.D.Tex.2005). The court is not troubled by the fact that advisors to the MAG Committee and the Corp Committee would calculate value to protect against under-satisfaction of their constituencies or that the advisors to Phoenix and the Equity Committee would adopt the opposite approach. The court understands as well Blackstone's election to be cautious against over-estimating value; after all, the valuation process involves predictions into a distant future. *Id.* at 816.

However, it was apparent from early in the Valuation Hearing that natural gas prices were running considerably above the estimates used for calculating future cash flow by Debtors, the MAG Committee and the Corp Committee.[37] There was good reason to believe that the increase in natural gas prices would push up the value of Debtors. *Id.* at 816.[38] The court, relatively early in the Valuation Hearing, advised the parties that it anticipated requiring a recalculation of value based on the changes in trends in commodity prices.[39]

Although the experts testifying in court (and Debtors' personnel) opined that the change in gas price trends would not have a significant effect on Debtors' value, as became obvious from the prices of Debtors' securities in the Fall of 2005 and the

36. Thus creditors of MAG had to be fully satisfied before value from the assets of MAG reached Mirant and Mirant's creditors, and only once Mirant's creditors were fully satisfied would any value be available for shareholders.

37. The court did not consider the valuation reports presented by the Equity Committee or Phoenix (*see In re Mirant Corp.*, 334 B.R. at 810 n. 30, 814); the reports offered by the other parties tended to adopt more dated and lower forecasts of gas prices than were otherwise available.

38. The court here does not refer to the sharp spike in gas prices in the 2005 Fall hurricane season. The court recognizes this anomaly was not foreseeable. But the more general upward trend in prices was clear during the Valuation Hearing, and that trend has supported the TEV of Debtors at the $12 + billion level consistently ever since. The difference between the financial advisors' estimates of value and the market's perception at the effective date cannot be attributed to just a conservative approach.

39. Conference with the parties conducted in chambers on May 25, 2005; recorded but not transcribed.

Winter of 2005–6,[40] in fact the change in the commodities markets resulted in Debtors' TEV exceeding $12 billion.[41] The values opined to by Blackstone, Houlihan and MBY, on the other hand, ranged from $7.843 billion to $9.245 billion.[42]

Had the financial advisors perceived the significance of the changing gas price environment, they would have recognized that their valuations were too low. Had they advised their constituencies of this,[43] the parties might have negotiated a consensual plan earlier.[44] Had the Plan been agreed to earlier, substantial costs and time would have been saved. Put another way, at the one point in these cases when the financial advisors occupied center stage, they failed to predict Debtors' value anywhere near correctly, persisted in stubbornly defending erroneous values[45] and, thus, contributed to the need for a much longer, more expensive valuation and negotiation process than was necessary. As it was, the gross underestimation of Debtors' value encouraged in some of the statutory fidu-

ciaries a recalcitrance in negotiation that delayed Debtors' emergence from chapter 11 and added substantially to the cost of Debtors' reorganization.

The Examiner testified at the Hearing that the financial advisors were very helpful in negotiating the term sheet which became the Plan. The Examiner also suggested that the financial advisors relied on others (e.g., MBY relied on PA Consulting Group, Inc., hereafter "PA") for gas price input in determining value. Thus, the Examiner suggests that, in fact, the financial advisors truly earned their success fees.

As to the first of these points, the difficulty of negotiating terms of a plan was exacerbated by the parties' misperceptions of Debtors' value. Had the MAG Committee, the Corp Committee and Debtors been advised such that they recognized that Debtors' value was probably sufficient to warrant meaningful equity participation, negotiation of a plan would have been easier and much time and money would have been saved.

---

**40.** The court has described above market perceptions of the value of claims and interests in this case.

**41.** All parties in the case recognized that equity would be entitled to participate at a TEV of approximately $11.5 billion.

**42.** See Valuation Hearing, Examiner's Exhibit 1.

**43.** The court assumes that the advice given by the financial advisors to their clients was consistent with their adamant defense of low values during the sworn testimony at the Valuation Hearing.

**44.** Following the Valuation Hearing, the court issued two letter rulings requiring re-running of Debtors' business model and recalculation of TEV. During the process of recalculating values the principal parties agreed to a term sheet that ultimately was embodied in the Plan.

**45.** The value of Debtors was to be determined as of the effective date of the Plan. See Code

§ 1129(b)(2)(B). Coleman, during the Hearing, told the court he was pleased with his May 2005 valuation that ranged between $7.4 billion to $8.7 billion. It was his view that that amount, bearing interest, would, as of the time of the Hearing, calculate out to a value approximating the then-current market view of the TEV of the reorganized Debtors. However, had the court adopted Coleman's value, creditors of Mirant would have been entitled to virtually all the common stock of the reorganized parent debtor (the balance going to creditors of MAG) to the exclusion of equity. That would have resulted in overpayment of Mirant creditors (based on post-effective date stock prices) of approximately 10% ($600 million). During the Valuation Hearing the financial advisors often lectured the court on the omniscience of the securities markets; if those markets are, indeed, all wise, they have beyond any doubt proven that the value projections of the financial advisors were shortsighted.

As to the contention that the financial advisors were not responsible for the gas forecasts used in their valuations, the issues respecting those forecasts were not secret. The financial advisors could have predicted (as did the court) that the state of the commodities market in 2005 would likely result in a substantial increase in Debtors' TEV as determined through applicable valuation methods. Given the cost to creditors and shareholders of "financial advice" from experts of the caliber of the Applicants in this category, it would not be too much to expect better performance. Certainly, the court does not see any reason to attribute the success of these cases to this class of Applicants.

Nevertheless, the court cannot find that the terms of employment of the financial advisors have proven to be "improvident" (Code § 328(a)); the court must therefore honor those terms. On the other hand, the court is not disposed to provide to the financial advisors to Debtors, the MAG Committee and the Corp Committee more than the minimum to which they are entitled under their agreements. This means that Houlihan will arguably be favored at the expense of the other advisors [46]—a regrettable consequence of the requirement that the court apply section 328(a) strictly.

## V. 503(b)(4) Applications

### A. In General

Five Applications ask payment for professionals that did not serve statutory fiduciaries (the Committees, Debtors and the Examiner) but rather advised and assisted other parties in interest. Two of these parties (the MAG ad hoc Committee and Corp ad hoc Committee) were organized, unofficial committees of creditors; and two (Phoenix and the Convenience Creditors) were creditors representative of a number of similarly situated creditors. Wilson seeks fees and reimbursement for services rendered on behalf of himself and other shareholders of Mirant.

■ Applicants requesting compensation under Code § 503(b)(4), unlike professionals employed with court approval by statutory fiduciaries, seek an exception to the general rule that unsecured creditors in a chapter 11 case must pay their own professional fees. Put another way, while it is presumed that professionals employed by statutory fiduciaries will be paid by the estate, that presumption is reversed for Applications in the category the court now addresses.

■ In order to qualify for payment by the estate, each of the instant Applicants must fall within Code § 503(b)(4), which states:

(b) After notice and a hearing, there shall be allowed administrative expenses . . . including—

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reim-

---

**46.** The court might consider Blackstone entitled to more than the minimum agreed to given Coleman's work on the court's behalf on the recalculation of Debtors' TEV. However, the cost of Houlihan (which contributed less but negotiated better) is such that the court is not inclined toward generosity. Moreover, Blackstone was being paid month-

ly for service to Debtors during the recalculation of TEV, though its work at that time was at the court's behest. Moreover, had Blackstone done a better job initially of predicting value, as discussed above, a consensual plan might have been possible without the need for recalculation of TEV.

bursement for actual, necessary expenses incurred by such attorney or accountant;

This provision establishes that payment of professional fees as an administrative expense of the estate requires that (1) the compensation sought be "reasonable;" (2) the compensation be for services of an attorney or accountant; (3) the attorney or accountant be employed by an entity that is entitled to payment of expenses under Code § 503(b)(3); and (4) the compensation must be warranted by the time, nature, extent and value of the professional services. Expenses of an attorney or accountant may also be reimbursed if "actual [and] necessary." In the case of the Applications before the court, in order for professional fees to be payable, the entity that retained the professional must satisfy the requirement of Code § 503(b)(3)(D) that it be "a creditor . . . , an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of [the Code], [that makes] a substantial contribution in a case under chapter . . . 11 . . . ."

■ Courts have applied a number of tests in determining whether a party's efforts effected a substantial contribution in a case. First, courts often require a showing of benefit to the estate.[47] The statute, however, does not so require—the language chosen by Congress, "substantial contribution in a case," makes no reference to the estate, though certainly such language could have been crafted (*see, e.g.,* Code § 503(b)(3)(B) which provides for reimbursement of a creditor that recovers property "for the benefit of the estate.").[48] In the case at bar, the court will consider compensable under section 503(b) services that substantially contributed to the proper allocation of Debtors' value among stakeholders.[49]

■ Second, Courts have assessed whether the services involved in the contribution were undertaken just for the applying creditor or interest-holder or for the benefit of all parties in the case.[50] In the case at bar, the parties seeking reimburse-

---

47. *See In re Cellular 101, Inc.,* 377 F.3d 1092, 1096 (9th Cir.2004) (citing *In re Consol. Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir. 1986) (holding that "the principal test of substantial contribution is 'extent of benefit to the estate' "); *In re DP Partners, Ltd. P'ship,* 106 F.3d 667, 673 (5th Cir.1997) (holding that "[a]t a minimum . . . the Court should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate . . . "); *Lebron v. Mechem Fin. Inc.,* 27 F.3d 937, 944 (3d Cir.1994) (holding that "in determining whether there has been a 'substantial contribution' pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.") (quoting *In re Lister,* 846 F.2d 55, 57 (10th Cir.1988)).

48. The court in any case considers it appropriate to evaluate what constitutes a benefit to the estate in light of the Supreme Court's determination that a tort by an estate repre-

sentative qualifies as an administrative claim as being a necessary cost of preserving the estate. *See Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). Thus, that which leads to fair and equitable satisfaction of a class of creditors by the estate benefits the estate.

49. The MAG ad hoc Committee seeks reimbursement for professional services that, in part, related neither to valuation of Debtors nor negotiation of the Plan. The court will address this below. The other Applications all relate to valuation and/or the Plan and, thus, pertain to allocation of value among stakeholders.

50. *See In re Lister,* 846 F.2d 55, 57 (10th Cir.1988); *In re Am. Plumbing & Mech. Inc.,* 327 B.R. 273, 283–84 (Bankr.W.D.Tex.2005); *In re Lloyd Sec., Inc.,* 183 B.R. 386, 394–95 (E.D.Pa.1995); *In re Jack Winter Apparel, Inc.,* 119 B.R. 629, 633 (E.D.Wis.1990).

ment or professional compensation under section 503(b) did not act for the benefit of all parties in the case. Rather, each acted to benefit a class of creditors or interest-holders of which class it was a member. The court concludes that each of the Applicants, by so acting, satisfied the requirement that the party's conduct serve the more general good.[51]

■ A third, related factor is whether the applying party would have done the same thing absent the expectation of compensation from the bankruptcy estate.[52] The court is disinclined to place much weight on this factor. Each party applying under Code § 503(b) knew—or surely should have known—it might or might not qualify for and so receive reimbursement or compensation from Debtors' estate. Thus, those parties acted without any certainty—or even confidence—that they would be so paid. That being so, the conclusion that potential reimbursement or compensation was not the motive of the parties is inescapable.

■ A fourth factor the court must address is whether the benefit conferred through the party's "substantial contribution" exceeds the cost the party seeks to assess against the estate.[53] In this context the court must consider whether the product of the Valuation Hearing and negotiations leading to the Plan was sufficiently

preferable to what might have otherwise resulted to justify the charges sought under section 503(b). The court has no trouble concluding that the work of the parties, to the extent it contributed substantially to the Letter Rulings or Plan negotiations, was of greater value than the cost of that work. Absent the Valuation Hearing, the court would have been faced either with the need to determine value during a confirmation hearing or with no meaningful record from which to deduce value. Absent successful negotiations respecting the Plan, the court was advised to expect at least two weeks of confirmation hearings— as opposed to the two days actually required. Absent the Valuation Hearing and consensus on the Plan, the parties would have faced more lengthy litigation and concomitant costs and uncertainty. Absent the Valuation Hearing and the subsequent negotiations, the result in these cases might not have so accurately reflected Debtors' TEV. The court is satisfied that the savings and achieved results warrant the compensation and reimbursement it awards below.

■ Fifth, the court must address whether the efforts of those seeking compensation or reimbursement under section 503(b) were duplicative of those undertaken by statutory fiduciaries.[54] This factor is of considerable importance with respect

---

**51.** Although the Fifth Circuit indicated in *DP Partners*, 106 F.3d at 673, that "[b]enefits flowing to only a portion of the estate or to limited classes of creditors" should be regarded under section 503(b) as diminished in weight, in doing so the Court, by defining the issue as a matter of degree, acknowledged that benefit to a class is worthy of some consideration and meets the "substantial contribution" requirement. Moreover, as this court noted above, where, as here, the issue is less one of the sufficiency of the estate than the proper allocation of its value, ensuring fair return to a class benefits the case and the estate.

**52.** *See* 4 Collier on Bankruptcy ¶ 503.10[5] (15th ed. rev.2002). The court has not found support in case law for consideration of this factor.

**53.** *See Am. Plumbing*, 327 B.R. at 282; *In re Lease-A-Fleet, Inc.*, 148 B.R. 419, 429 (Bankr. E.D.Pa.1992).

**54.** *See Am. Plumbing*, 327 B.R. at 279 (citing *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir.1986)).

to the MAG ad hoc Committee and its Application will be addressed on this subject below. As to the other parties applying under Code § 503(b), the court does not consider duplication to be significant. While each of the parties (arguably excepting Phoenix) was represented by a statutory fiduciary,[55] the contribution made by each of the parties was in addition to work done by its statutory representative. The court, in so stating, recognizes that the Valuation Hearing occupied 27 days. The contribution of Wilson and the valuation part of Phoenix's contribution occupied a small part of that hearing. However, the court does not think it appropriate to limit compensation to a participant in a hearing to the time during which the participant was actually active. Phoenix and Wilson quite properly deferred to the Equity Committee through most of the Valuation Hearing and, for the most part, only addressed the court when they had something useful to add. Yet they could not have made their contributions without attending the entire Valuation Hearing. The court thus concludes that a substantial contribution to valuation (and hence to the Letter Rulings) justifies compensation or reimbursement under section 503(b) for attendance throughout the Valuation Hearing.

■ The court has identified two additional factors it believes it must consider in addressing this category of Applications.

First, Phoenix in particular has profited handsomely from its purchase of Debtors' securities. Phoenix bought publicly traded subordinated debt of Mirant[56] after the commencement of these chapter 11 cases. It paid approximately 34 cents on the dollar for that debt.[57] Under the Plan, Phoenix received securities worth more than 100% of face value of its claims.[58] The court thus considers Phoenix had ample reason on its own account to participate in the Valuation Hearing and plan negotiations.

■ In awarding compensation, the court necessarily exercises its in rem, equitable jurisdiction. 1 Collier on Bankruptcy ¶ 2.09 (14th ed.1974). Equity is invoked by Courts to prevent injustice. *In re Multiponics, Inc.,* 622 F.2d 709, 721 (5th Cir. 1980). Thus, the thrust of section 503(b)(4) should be to prevent a creditor or interest holder from suffering greater loss from a debtor's bankruptcy than do its peers where that loss resulted from expenditures by the applying party that benefited those very peers. Given that Phoenix suffered no loss in the value of its investments by reason of Debtors' chapter 11 filings but rather profited from the situation through post-petition trading, the court believes its situation is different from a creditor who faced substantial loss due to a bankruptcy filing and stepped in to aid the process to the benefit of itself and

---

**55.** The MAG ad hoc Committee and the Corp ad hoc Committee had obvious statutory counterparts. The Convenience Creditors were arguably represented by the Corp Committee. Wilson, representing shareholders, served constituents of the Equity Committee. Phoenix was in theory represented by the Corp Committee. However, because the debt held by Phoenix (and others similarly situated) was subordinate to most other Mirant debt, its interests during the Valuation Hearing and negotiation of the Plan were more in line with those of the Equity Committee.

**56.** Phoenix holds in the aggregate 840,100 of the Trust Preferred Shares issued by Mirant. The Trust Preferred Shares were backed by a subordinated obligation of Mirant.

**57.** Transcript of Hearing, June 6, 2006, p. 263, line 5.

**58.** At the time of the Hearing, the securities received by Phoenix were worth 120% of the face value of the Trust Preferred Shares. *Id.* at lines 9–10.

others similarly situated. Phoenix is not such a sympathetic applicant. It *chose* to become involved with a bankrupt entity; if Phoenix expended funds to make that involvement profitable, it is more properly a cost of doing business for Phoenix than a charge to be borne by creditors and shareholders generally. Although the court will not consider this dispositive of Phoenix's entitlement to recompense, it is a factor which must necessarily chill any impulse toward generosity.[59]

Finally, the court, in the case of Wilson, must consider the Applicant's negative effect on these cases. As discussed below, the court does not question that Wilson contributed to the Valuation Hearing and therefore to the Letter Rulings. However, Wilson has also caused Debtors to incur costs responding to questionable objections to Debtors' Second Amended Disclosure Statement (the "Disclosure Statement") and confirmation of the Plan. Even more significantly, Wilson engaged in an improper and misleading solicitation of shareholder votes on the Plan. *See In re Mirant Corp.*, 334 B.R. 787 (Bankr. N.D.Tex.2005). The cost to the Debtors' estates of Wilson's conduct substantially off-sets the value of his contribution in these cases, and the court will take this into account below.

## B. The Applications

Having set the groundwork, the court now turns to the specific Applications for reimbursement.

### 1. Convenience Creditors

 The Convenience Creditors seek reimbursement of counsel's fees for the law firm of Warner Stevens, LLP. The Convenience Creditors[60] were purchasers of Mirant convenience class claims that negotiated with Debtors at the time of confirmation to obtain interest on such claims from case commencement to the effective date of the Plan. The Plan as mailed to creditors did not provide for interest on convenience class claims. *Compare* Plan dated September 30, 2005, § 5.1(d), to Plan dated December 9, 2005, §§ 5.1(d) and 10.14(d). But for this change to the Plan, the Convenience Creditors would have opposed its confirmation.

The Convenience Creditors ask payment of $75,000 for this contribution to the Plan's confirmation. There are no objections to this Application. The amount sought is relatively small in the context of these cases, and the court considers it reasonable. By eliminating one of the issues that might have required attention at the confirmation hearing, the Convenience Creditors have saved costs and time; the latter savings provided special benefit to all parties by ensuring an earlier effective date. For these reasons, the Application of the Convenience Creditors will be GRANTED.

### 2. The Corp ad hoc Committee

 The Corp ad hoc Committee seeks payment in the amount of $284,509.10.

---

**59.** The same argument is applicable to all other Applications in this category, though the MAG ad hoc Committee, at least, held substantial claims prepetition in the MAG case. For reasons given below, trading profits need not be considered as to Wilson. With regard to the Corp ad hoc Committee and the Convenience Creditors, the amounts sought are sufficiently small that the court need not consider this factor.

**60.** The Convenience Creditors are: Sierra Liquidity Fund, LLC, Sierra Nevada Liquidity Fund, LLC, The Coast Fund LP, Contrarian Funds LLC, Argo Partners, Longacre Master Fund, Ltd., Madison Distressed Strategies LLC, Madison Liquidity Investors 116, LLC, Madison Liquidity Investors 123, LLC, Madison Liquidity Investors 124, LLC, and Madison Niche Opportunities, LLC.

There has been no objection to this Application. Although the amount involved is not inconsequential, it is, again, relatively small in the context of these cases. The court finds the amount sought to be reasonable.

The Corp ad hoc Committee was formed following issuance of the Letter Rulings. The record reflects that the Equity Committee, Phoenix and the Examiner asked that the bondholder members of this committee organize to facilitate negotiations toward a consensual plan.[61] The evidence also indicates that the formation and participation in negotiations of the Corp ad hoc Committee were critical to obtaining Corp Committee agreement to the term sheet which was the basis for the Plan. It was in substantial part through the intervention of the Corp ad hoc Committee that the parties were able to reach an agreement concerning the level of participation through the Plan by equity and holders of subordinated debt like Phoenix.

As discussed above, the Plan appears to have allocated Debtors' value as Congress intended. Though brief, the role played by the Corp ad hoc Committee was critical. The court concludes that the committee's efforts constitute a substantial contribution and justify payment as sought in the Application. Accordingly, the Application will be GRANTED.

### 3. The MAG ad hoc Committee

 The MAG ad hoc Committee seeks $2,884,094.11 representing the cost of its counsel in these chapter 11 cases. If Code § 503(b), like sections 506(b) and 365(b), operated to make a party whole for its costs in chapter 11 proceedings, this request would be grantable. Section 503(b)(4), however, is not intended as are these other sections to reimburse specially situated entities like the over-secured creditor or the counter-party to an assumed contract for their reasonable and necessary professional fees. Rather, section 503(b)(4) is meant to deal with the special case of legal or accounting fees that directly benefited the case. The court is comfortable that counsel to the committee performed their tasks competently and efficiently, but merely representing a client in an active role in a chapter 11 case is not sufficient to trigger section 503(b)(4). *See In re The Columbia Gas Sys.*, 224 B.R. 540 (Bankr.D.Del.1998); *In re Granite Partners, L.P.*, 213 B.R. 440 (Bankr.S.D.N.Y. 1997); *In re McLean Indus., Inc.*, 88 B.R. 36 (Bankr.S.D.N.Y.1988); *In re Ace Fin. Co.*, 69 B.R. 827 (Bankr.N.D.Ohio 1987).

 The MAG ad hoc Committee has not made a substantial contribution in these cases;[62] as discussed in the above-

**61.** Transcript of Hearing, June 7, 2006, pp. 367–369.

**62.** The MAG ad hoc Committee's Application does not identify any quantifiable benefit to Debtors' estate. The Application urges that the committee's organizational and representative role, its ability to bring a substantial share of the represented constituencies to the table, its part in bringing about 100% recovery for MAG creditors, and its role in negotiating and papering (especially in terms of lock-up agreements for its members) the term sheet that led to the Plan justify compensation under Code § 503(b)(4). However, unlike Phoenix and the Convenience Creditors, there is no evidence that the MAG Committee did not fully represent the same constituencies. The recovery by MAG creditors surely would have been 100% if negotiations had been handled solely by the official committee, and drafting lock-up agreements does not seem to the court to rise to the level of a "substantial contribution."

The MAG ad hoc Committee makes much of the "agreement" of other major parties in this case to payment of the committee's fees and expenses. But the court does not understand the other parties in the case to be proponents of payment of the MAG ad hoc Committee; rather the other parties simply agreed not to

cited cases, active participation is not enough. The court has identified no instance where the MAG ad hoc Committee has, to the exclusion of the MAG Committee, advanced these chapter 11 cases, brought value to Debtors or provided a distinct benefit to a particular constituency.

In considering an application for substantial contribution, a Court must consider whether the claimed expenses are duplicative of other parties' expenses in the case.[63] Here, the MAG ad hoc Committee argues it was *more* representative of a class of bondholders than was the statutory committee, but the statutory committee included members of the same classes as those represented by its informal cousin, and had the UST been approached, no doubt the committee could have been expanded to add members of those classes. Further, the court witnessed no instance in which the position of the MAG ad hoc Committee was significantly different from that of the MAG Committee. Though counsel to the MAG ad hoc Committee attended every significant hearing in these cases (including the entire Valuation Hearing), counsel rarely participated actively. Where the informal committee took an independent position at all, it was typically more aggressive. While being *more* aggressive is certainly not improper and may have seemed good tactics, it was reasonably clear from early in these cases and by the Valuation Hearing beyond serious doubt that creditors of MAG would be fully satisfied in these cases.[64] Indeed, by the time of the Valuation Hearing, notwithstanding remaining uncertainty over the outcome of these cases, public debt of MAG was trading at par plus at least some interest.[65] Thus the benefit to these cases of a party pursuing the interests of MAG creditors more aggressively than did the official committee is questionable. The court certainly considers it beyond cavil that the MAG Committee competently and fully represented all its constituencies, including those making up the MAG ad hoc Committee.

Finally, a principal reason for the formation of the MAG ad hoc Committee was to provide its members with a voice in these chapter 11 cases without subjecting them to the restrictions in trading Debtors' securities that were applicable to members of the official committee.[66] Code § 503(b)(3)(D) and (4) was intended to encourage parties that are not statutory fiduciaries to be active, positive contributors to the reorganization process. It was not

object to the fees and expenses sought in the committee's Application. *See* Plan § 6.2(d)(ii).

**63.** *See, e.g., In re Consol. Bancshares, Inc.,* 785 F.2d 1249 (5th Cir.1986) (holding that the applicant was not entitled to an award of attorney fees as having made a "substantial contribution" in a chapter 11 case where, among other things, the applicant's efforts were duplicative of those of an equity security holders' committee).

**64.** This fact is one that distinguishes the MAG ad hoc Committee from Phoenix and Wilson, who were faced by the possibility that they would receive no return on their investments. *See* Disclosure Statement, Schedule 14.

**65.** As of April 1, 2005 (the Valuation Hearing commenced on April 18, 2005), bonds issued by MAG were trading at between 106% and 113.3% of face value. Indeed, the MAG bonds traded above par at all times after January 1, 2005.

**66.** *See "Order Approving Specified Information Blocking Procedures and Permitting Trading in the Debtors' Securities, Bank Debt, Purchase or Sale of Trade Debt and Issuing of Analyst Reports Upon Establishment of a Screening Wall Effective July 25, 2003,"* (Docket No. 461) entered on August 18, 2003, and its progeny, which established reporting, screening, and other requirements pertaining to trading for entities represented on the Committees.

meant to provide large trading institutions [67] an opportunity to organize to play a central role in a chapter 11 case while avoiding the circumscriptions necessarily applicable to membership on a statutory committee. This court cannot and does not question the right of creditors to profit through trading in a chapter 11 debtor's securities—as members of the MAG ad hoc Committee did [68]—but it is not prepared to hold that Congress intended section 503(b) as a mechanism to allow such creditors to both have their cake and eat it too.

For all these reasons, the court DENIES the Application of the MAG ad hoc Committee. In doing so, the court does not mean to minimize the good and useful counsel of the committee's lawyers. The court simply holds that good counsel does not amount to a "substantial contribution" and there is, therefore, no statutory basis for granting the Application.

### 4. Phoenix

■ Phoenix asks for reimbursement of professional costs of $5,280,773.86.

There is no objection to the Application, and the court is satisfied that Phoenix made a substantial contribution to these chapter 11 cases. Phoenix, which held approximately 12% of Mirant's subordinated debt, was a major participant in the Valuation Hearing and played a central role in negotiating the term sheet which formed the basis of the Plan. The court found the testimony elicited from Prof. Israel Shaked (one of Phoenix's experts) especially useful; that testimony figured in the formulation of the Letter Rulings.

Although the Application thus merits granting as to attorneys' fees, the court cannot grant it to the extent it seeks to recover the cost of Prof. Shaked's and Paul Ruwe's services. Section 503(b)(4) permits only "compensation for professional services rendered by an attorney or an accountant." Thus, by its plain meaning, the provision excludes other professionals, including, in this case, Prof. Shaked and Mr. Ruwe.[69]

■ Collier on Bankruptcy opines that section 503(b)(4) should be read broadly to

**67.** According to the initial 2019 statement filed by Hurt & Lilly, LLP and Kirkland & Ellis LLP, the initial members of the MAG ad hoc Committee were Cargill Financial Services International, Inc., Longacre Management, LLC, M.H. Davidson & Co., LLC, Satellite Asset Management, L.P., and Trilogy Capital LLC. This initial 2019 disclosure was subsequently amended to add further institutional members. The amended disclosures were filed under seal.

**68.** The 2019 statements that were filed under seal detail the trading activity of the members of the MAG ad hoc Committee. The 2019 statements reflect that the members did in fact trade extensively in securities of MAG and securities of the other Debtors.

**69.** It appears that the services of Shaked and Ruwe were billed to counsel for Phoenix. While there may be situations where employment of a professional through an attorney will permit payment of that professional as the attorney's expense (especially if the

amount involved is very small) the court is not prepared to so regard the fees of Shaked and Ruwe; rather, their cost must be considered as separate from the cost of legal services. *See, e.g., In re ACandS, Inc.,* 297 B.R. 395, 404–05 (Bankr.D.Del.2003) (holding that a subcontract agreement could not circumvent the requirements of section 327(a)) (citing *In re United Companies Financial Corp.,* 241 B.R. 521, 528 (Bankr.D.Del.1999)).

Shaked billed Phoenix's firm through his consulting company, The Michel–Shaked Group. Ruwe billed through Muse Stancil & Co.

Even absent the language of section 503(b)(4), the court could not find Mr. Ruwe's services compensable by the estate. He did not testify at the Valuation Hearing and his valuation report was never offered into evidence. *See In re Mirant Corp.,* 334 B.R. at 810, n. 30. During the Hearing, Mr. David Rosner, its lead counsel, argued that Mr. Ruwe had helped him prepare for the Valuation Hearing, but, given that section 503(b)(4) should be narrowly construed, the court does not

cover professionals other than attorneys and accountants. 4 Collier on Bankruptcy ¶ 503.11[1] (15th ed. rev.2002). This court is not prepared, however, to overlook the precise language chosen by Congress. In the absence of binding precedent to the contrary (as with, *e.g.*, *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)), a bankruptcy court should adopt and apply the plain meaning of the Code unless to do so would lead to an absurd result. *See Lamie v. United States Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); *In re Kalter*, 292 F.3d 1350 (11th Cir.2002); *First Merchants Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394, 403 (3d Cir.1999).

Congress chose the words "an attorney or any accountant" in section 503(b)(4). Where Congress intended to reach other sorts of professionals, it said so. *Compare* Code § 327(a) (referring to "attorneys, accountants, appraisers, auctioneers, or other professional persons") to Code § 327(d) ("the trustee [may] act as attorney or accountant") and Code § 327(e) (the "trustee ... may employ ... an attorney"). *See,* similarly, Code §§ 1103(a) and 1107(b). Limiting a party that is in essence a volunteer to reimbursement of attorney and accounting fees is not an absurd result. Moreover, the Supreme Court in *Lamie* has pointed the way toward a strict reading of parts of the Code dealing with compensation. *See Lamie v. United States Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).

It is true that section 503(b) is "inclusive" in its listing of administrative ex-

penses. *See* Code §§ 503(b), 102(3). However, the specificity (and exclusive language) of section 503(b)(4) suggests a limited scope for that category of expense. Moreover, section 503(b)(4) represents a limited exception to the general rule that general unsecured creditors are not entitled to payment for professional fees incurred. *See In re Consol. Bancshares, Inc.*, 785 F.2d 1249 (5th Cir.1986) (holding that "a creditor's attorney must ordinarily look to its own client for payment"). For all these reasons, the court holds the scope of section 503(b)(4) to be limited to attorney and accountant fees.

Because the court holds it cannot award expert witness (or financial advisor) fees under Code § 503(b)(4), it will not additionally reduce the amount paid to Phoenix based on its post-petition trader status. If it were able to reimburse Phoenix for the cost of Dr. Shaked, the court would nevertheless reduce the amount payable to Phoenix similarly in light of its status as one that elected to become a creditor of a chapter 11 debtor and the considerable profits it made on securities purchased after the commencement of these cases.

For the foregoing reasons, the Application of Phoenix will be GRANTED to the extent of $4,184,757.91. Otherwise, the Application is DENIED.

### 5. Wilson

Wilson's Application seeks payment of fees and expenses totaling $645,146.64.[70] Debtors and the Equity Committee have objected to this Application.

■■■ As a threshold matter, Debtors earlier[71] asked the court to render judgment against Wilson on the basis that, in

---

consider that enough to connect Mr. Ruwe's services to Phoenix's substantial contribution.

**70.** Wilson initially asked for payment of $712,518.15 (plus a 1% contingency discussed below), but thereafter reduced the request by $67,371.51, representing amounts sought for

services rendered for his work on the Equity Committee.

**71.** *See "New Mirant Entities' Opposition to (I) First and Final Fee Application of Frank Smith, Kent Koerper, Peter Depavloff, Bart En-*

order to qualify for payment under Code § 503(b)(4), attorneys' fees and expenses must have been paid by the attorney's client; that is, the section 503(b)(4) *applicant* itself must be the party entitled to reimbursement under section 503(b)(3). Although Debtors' position has support, it is not consistent with the plain meaning of Code § 503(b)(4).[72] The only authority that provides a rationale for the Debtors' position is *In re Olsen,* 334 B.R. 104, 107 (Bankr.S.D.N.Y.2005). In the *Olsen* case, the Court held that "the statute contemplates that the fees covered by subsection (b)(4), like those covered by subsection (b)(3), will have been 'incurred by' a creditor." *See id.* This court declines to follow *Olsen.* As Judge Leslie Tchaikovsky stated in *In re Western Asbestos Co.,* 318 B.R. 527, 530 (Bankr.N.D.Cal.2004), section 503(b)(4) establishes no requirement that fees be paid by the client before they may be recovered from the estate. The language of section 503(b)(4) is distinctly dif-

ferent from that used in the subsections of section 503(b)(3) which specifically refer to the "creditor," "indenture trustee," "equity security holder" or "custodian" as the one that must seek reimbursement. Nor is it absurd to read section 503(b)(4) to allow direct application by an attorney or accountant. An attorney or accountant who identifies a potential benefit to a chapter 11 case but whose client is unwilling to absorb the whole cost of pursuing that benefit should not be denied the hope of compensation if he or she is prepared to accept the burden of going forward on the client's behalf. The court thus holds that, by its plain language, Code § 503(b)(4) allows attorneys and accountants to apply directly for payment by the estate if they represent a party specified in section 503(b)(3).

▪ Having concluded that the Wilson Application may be considered, the court turns next to the merits of the Application.[73] The court agrees that Wilson made

---

gram, Mary Leight, and L. Matt Wilson for Allowance of Compensation for Fees and Reimbursement of Expenses of the Wilson Law Firm, P.C. Pursuant to 503(b) of the Bankruptcy Code; and (II) First and Final Fee Application*" (Docket No. 13672) (Hearing held on June 14, 2006).

**72.** The Third Circuit has taken a restrictive position with respect to 11 U.S.C. § 503(b)(4). *See Lebron v. Mechem Fin. Inc.,* 27 F.3d 937, 943 (3d Cir.1994). In *Lebron,* the Third Circuit followed what it said was a literal interpretation of sections 503(b)(3) and 503(b)(4) and held that section 503(b)(4) authorizes awards of legal and accounting fees only in situations within the scope of section 503(b)(3)—that is, where the creditor or equity owner has in fact incurred expenses that are allowable under section 503(b)(3). *Id.* at 278. This court does not believe that a literal reading of the statute mandates that in order for a creditor's attorney to receive an award of attorneys' (or accountants') fees for making a substantial contribution, that creditor must prove that the creditor *actually incurred* an allowable separate expense under section

503(b)(3). *See* discussion in *In re Sedona Inst.,* 220 B.R. 74, 79 (8th Cir. BAP 1998). Rather, the court reads section 503(b)(4) as requiring that the entity (that is responsible for the attorneys' or accountants' fees) be capable of incurring an allowable expense. The act of actually incurring the hypothetical expense is not a prerequisite to seeking fees under section 503(b)(4). Stated another way, the words "entity whose expense is allowable under... paragraph (3)..." defines the universe of entities capable of making an application under section 503(b)(4), i.e, requires that the fees sought be for an attorney or accountant that acted for a creditor (*e.g.*) that made a substantial contribution to the case. Whether that creditor seeks its actual, necessary expenses, other than compensation and reimbursement specified in section 503(b)(4), is the prerogative of the creditor. In so holding this court reaches the same result that Judge Clark reached in *In re Am. Plumbing & Mech., Inc.,* 327 B.R. 273 (Bankr.W.D.Tex.2005).

**73.** At the Hearing the court advised the parties that it intended to deny the Application to the extent that the 1% bonus sought by Wilson

a substantial contribution in these cases. Wilson participated actively in the Valuation Hearing. That participation affected the court's Letter Rulings in at least two respects. First, Wilson's efforts led the court to require recalculation of the effect of taxes on Debtors' cash flow. Second, Wilson contributed to the court's conclusion that $357 million should be added to Debtors' TEV, representing funds reserved against contingencies in Debtors' Philippines operations. While Debtors contend that the changes to account for taxes would have had no meaningful impact on cash flows, and while the $357 million addition to value was only a small part of the shift necessary for equity to be "in the money," all the evidence before the court suggests that the Letter Rulings motivated the parties to come together on a consensual plan. Thus, Wilson, by contributing to the need for the Letter Rulings, contributed to the excellent result in these cases.

Wilson, however, overestimates the magnitude of the contribution made. It is probable that the court would have identified the $357 million in value increase without Wilson's efforts; the issue was given considerable attention by the Equity Committee and Phoenix as well. Many other of Wilson's imagined contributions had no weight. For example, the court's views regarding the significance to Debtors' reorganization of the Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) were largely formed before briefing by the parties, and Wilson's motion based on *Till* and his arguments in support of the motion were not persuasive and did not affect the court's conclusions. Some categories of time in Wilson's Application, such as time spent on "settlement matters" or work concerned with the "solicitation materials dispute" did not provide benefit generally in these cases.

Further, Wilson's contribution to these cases has not been entirely positive. As reflected in *In re Mirant Corp.*, 334 B.R. 787 (Bankr.N.D.Tex.2005), Wilson disrupted the process of soliciting votes on the Plan. Wilson's objections to the Disclosure Statement and to confirmation of the Plan were not particularly well-grounded and required unnecessary rebuttal by other parties as well as the use of court time. Even the Application now under consideration included a number of instances of clear over-reaching (*e.g.*, Wilson's request for payment of attorney's fees for time spent as a member of the Equity Committee [74]) that required other parties to expend estate resources in contest. While Wilson has brought some benefit to these cases, he has been more gadfly than Godfather to the excellent result.

For all these reasons, as well as Wilson's duplication of efforts by the Equity Committee and the considerable profits earned

---

on account of equity's recovery exceeds 1% of the actual recovery by Wilson's clients. The reasons for this decision are largely incorporated below. However, the court would note that Wilson's request for payment of fees equal to 1% of the recovery by all equity owners is itself, to the court's knowledge, unprecedented. While this court is prepared to entertain compensation requests under section 503(b)(4) made directly by attorneys and accountants, the court does not intend to import into section 503(b) any entitlement to fees other than those provable in accordance with the requirements of Code § 330 and consistent with the tests applied in *In re First Colonial Corp. of Am.*, 544 F.2d 1291 (5th Cir.1977) and *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974).

74. Although Wilson eventually withdrew this portion of his Application, other parties incurred fees (chargeable to the Debtors' estate) challenging the allowance of Wilson's fees for time spent as a member of the Equity Committee.

by Wilson from trading in Debtors' securities,[75] the court concludes Wilson is entitled to only partial payment of sums sought in the Application. The court believes that a fair return to Wilson from Debtors' estate is $15,000. This amount should more than defray Wilson's out-of-pocket costs for attending the Valuation Hearing. The court concludes that payment of this amount is consistent with the purposes of section 503(b)(3)(D) and (4) yet does not reward Wilson for conduct that should not be encouraged in chapter 11 cases.

## VI. Bonuses

### A. In General

■ The court must now turn to the Pool Motion, the Bonus Application and the requests for enhancement filed by the Examiner and his counsel. To begin with, payment of counsel (or any other professional) in excess of the lodestar amount is very much an exception to the general rule. *See generally,* 3 Collier on Bankruptcy ¶ 330.04[5][e] (15th ed. rev.1999). On the other hand, enhancement of fees is permissible in suitable cases.[76] In the case at bar the court specifically reserved to itself the ability to provide enhancements to lodestar amounts. *See* Procedures Order (dated Aug. 1, 2003; entered Aug. 4, 2003) at p. 3; Compensation of Professionals Order (dated Aug. 27, 2003; entered Aug. 28, 2003) at p. 2.

■ The case law does not provide the court with a uniform test for determining when to grant requests for enhancement.[77] Certainly there is no binding precedent that directs the court how to judge such requests. Clearly, a spectacular result is a necessary prerequisite to any enhancement. *See In re Nucentrix Broadband Networks, Inc.,* 314 B.R. 574, 578 (Bankr. N.D.Tex.2004). The court considers the result in these chapter 11 cases to meet this threshold requirement; indeed, the cases cited by the Court in *Nucentrix* largely focus on full payment of creditors,[78] as has occurred in these cases.

■ However, an excellent result is not enough. Nor is it sufficient that a professional helped bring about an excellent result. The professional's contribution to such a result is but one factor the court will consider.

■ The court must also ensure that the professional seeking a fee enhance-

---

**75.** Wilson acquired stock (and other securities of Debtors) after commencement of these cases when prices were at or near historic lows.

**76.** *See, e.g., In re Lawler,* 807 F.2d 1207 (5th Cir.1987); *In re Nucentrix Broadband Networks, Inc.,* 314 B.R. 574 (Bankr.N.D.Tex. 2004); *In re El Paso Refinery, L.P.,* 257 B.R. 809 (Bankr.W.D.Tex.2000); *In re Farah,* 141 B.R. 920 (Bankr.W.D.Tex.1992); *In re Intelogic Trace, Inc.,* 188 B.R. 557 (Bankr. W.D.Tex.1995); *In re Manoa Fin. Co., Inc.,* 853 F.2d 687 (9th Cir.1988); *In re Morris Plan Co. of Iowa,* 100 B.R. 451 (Bankr. N.D.Iowa 1989); *In re Powerine Co.,* 71 B.R. 767 (9th Cir. BAP 1986); *In re Summit Comm. of Fla., Inc.,* 84 B.R. 863 (Bankr. S.D.Fla.1988); *In re Baldwin–United Corp.,* 79 B.R. 321 (Bankr.S.D.Ohio 1987).

**77.** *See In re Chewning & Frey Sec., Inc.,* 328 B.R. 899 (Bankr.N.D.Ga.2005) (observing that the Supreme Court has yet to address fee enhancements in bankruptcy matters); *In re Chary,* 201 B.R. 783 (Bankr.W.D.Tenn.1996) (citing *In re Farah* for the proposition that there are no uniform standards by which to arrive at fee enhancement awards).

**78.** As the *Nucentrix* Court noted, "at least two bankruptcy courts have *required* that all creditors of the estate be paid in full before allowing a fee enhancement," (citing *In re Morris Plan Co. of Iowa,* 100 B.R. 451 (Bankr. N.D.Iowa 1989); and *In re D.W.G.K. Rest.,* 106 B.R. 194 (Bankr.S.D.Cal.1989)) (emphasis added).

ment has demonstrated exceptional efficiency in the performance of services. If the professional has been wasteful of estate resources, even if able to provide a rational reason for excess cost to the estate, that must negatively affect the court's decision respecting any enhancement of fees.

 Another factor the court will consider is the performance of the professional in a fiduciary context. Although the professional may arguably not itself owe fiduciary responsibilities other than to its client (*see, e.g.,* Robert W. Tuttle, *The Fiduciary's Fiduciary: Legal Ethics in Fiduciary Representation,* 1994 U. ILL. L. REV. 889 (1994), ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 380 (1994)), how the professional guides its fiduciary client must necessarily be a consideration in assessing whether a bonus has been earned. Each of the Committees, Debtors and the Examiner is a statutory fiduciary.[79] In order for chapter 11 to work as contemplated by Congress, each statutory fiduciary must perform its duties in a fashion consistent with the best inter-

ests of the estate and its beneficiaries.[80] It is the obligation of a professional retained by a statutory fiduciary to ensure that its client understands and acts consistently with the client's fiduciary responsibilities, including a commitment to achieving a fair and equitable result, and, in deciding whether a professional has earned a fee enhancement, the court must assess its effectiveness in this respect.

 Finally, the court will consider the relative amount of fees received by each professional pursuant to its lodestar calculation and the general quality of the professional's work.[81] Under Code § 330(a)(3)(F),[82] the court, in determining a lodestar amount, must consider cost of comparable services. This means that an attorney from New York City is entitled to compensation at rates prevailing in the New York City market.[83] Where, as in the instant case, local professionals have provided services of comparable quality at much lower cost, the court believes enhancement of fees to the local professionals is more justifiable than to those from

**79.** *See* Code §§ 1103, 1106(b), 1107(a), 1108; *In re Advisory Comm. of Major Funding Corp.,* 109 F.3d 219, 224 (5th Cir.1997) (discussing the duties under Code § 1103); *In re Lowry Graphics, Inc.,* 86 B.R. 74, 76 (Bankr.S.D.Tex. 1988) (discussing duties under Code § 1106); *In re Schepps Food Stores, Inc.,* 160 B.R. 792, 797 (Bankr.S.D.Tex.1993) (discussing duties under Code §§ 1106, 1107, and 1108).

**80.** The court of course recognizes that for a committee, for example, the interests of its constituents, to which it owes its primary duties, may not always be perfectly congruent with what is best for the estate. Likewise, as has certainly been true in the case at bar, estates of debtors controlled by the same management may have divergent interests. These problems need not be addressed, however, in the present context.

**81.** *See Nucentrix,* 314 B.R. at 578 (holding that "a professional may petition a bankrupt-

cy court for a fee enhancement or bonus if [its] work has been of superior quality").

**82.** Prior to BAPCPA, the section was numbered § 330(a)(3)(E).

**83.** *U.S. v. City of Jackson, Miss.,* 359 F.3d 727, 733 (5th Cir.2004); *see also In re El Paso Refinery, L.P.,* 257 B.R. 809, 832–33 (Bankr. W.D.Tex.2000). Congress very likely did not intend in enacting the Code to encourage debtors and other statutory fiduciaries to retain professionals from far afield when, as in the case at bar, highly competent professionals are available locally. *See* H.R. Rep. 95–595, at 330 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6286. However, the effect of the changes made to the law governing compensation has been to encourage in large reorganization cases consideration of professionals for retention nationally.

out of town who have billed at higher rates.

In applying the foregoing factors, the court does not intend that any one of them should be dispositive one way or another in determining whether to grant an enhancement. Rather, the court will weigh each of these factors both in determining whether there should be any enhancement and then in deciding how much that enhancement should be.

## B. Specific Cases

### 1. The Pool Motion

██ Pursuant to the Pool Motion, Debtors ask that the court, if it awards any enhancements to attorneys, set aside a pool of $4,000,000 to be divided among attorneys representing statutory fiduciaries. Counsel for Debtors, the Corp Committee and the MAG Committee support the Pool Motion.[84] Because the Examiner, counsel for the Examiner and counsel for the Equity Committee seek fee enhancements independently of the Pool Motion, the court will in this section of this memorandum opinion consider only the entitlement to an enhancement of counsel who have urged that motion.

With respect to the first factor, contribution to an excellent result, the court has already noted in this memorandum opinion and in open court its appreciation for the work of all counsel and the importance of that work in achieving a consensual plan that is fair and equitable. Were this the only test that had to be met to justify fee enhancements, the court would grant the Pool Motion. Consideration of the other factors cited by the court, however, requires denial of that motion.

First, while none of the counsel has been so inefficient as to warrant any reduction in this case in their compensation calculated on a lodestar basis, the court cannot find in their performance the high level of efficiency necessary to support an enhancement of fees. Indeed, the FRC has repeatedly commented on the duplication of effort, including attendance at hearings of multiple attorneys, some of whom have not been necessary.[85] The court has observed (and on occasion commented on) the same thing. For example, during the Valuation Hearing, Debtors often had more than four attorneys in the courtroom. The Corp Committee typically was represented by at least three attorneys, and the MAG Committee (which elicited no evidence other than through the agreed introduction of the Houlihan valuation reports) always was represented in court by two attorneys. Moreover, none of these attorneys were local (though both Debtors and the Corp Committee were represented by excellent counsel resident in Dallas or Fort Worth) and so required the estate to bear the cost of their food, lodging and transportation.

Each of Debtors, the Corp Committee and the MAG Committee was represented by (at least) two law firms. At virtually every hearing held in these cases through confirmation of the Plan, one (or often more) of the attorneys from each firm attended, though often attorneys in attendance did not participate in the proceedings.

---

84. Counsel for the MAG Committee filed a separate enhancement request but later withdrew it. Several professionals filed position papers stating that there should either be a pool for enhancing the fees of all hourly professionals or, if the court awarded any given professionals an enhancement, asking that they have the chance to seek an enhancement.

The court does grant some enhancements below; it will not consider further requests for enhancements from other professionals.

85. *See, e.g.,* Fourth Amended Final Fee Review Report of the Fee Review Committee (Docket No. 14107), n. 3.

Further, as noted by the FRC,[86] counsel do not seem to have made best use of more junior, less expensive attorneys.

In the case of the Corp Committee, one of the firms representing the committee, Simpson Thacher & Bartlett LLP, was replaced midway through the case by Shearman & Sterling LLP. While Shearman & Sterling LLP initially absorbed its cost of the transition,[87] the change in counsel affected the efficiency of the chapter 11 process. The court identified no reason—and the Corp Committee cited no reason except the preference of the committee's chair—why Simpson Thacher & Bartlett LLP should have been replaced. The direct and indirect costs of this change in counsel (including the cost of the hearing held to approve the substitution) would alone weigh heavily against any enhancement of fees for counsel to the Corp Committee.

The court has similar concern with counsel to the MAG Committee. As already discussed, Houlihan proved to be an unreasonably expensive financial advisor. The agreement that has proven so lucrative to Houlihan was negotiated with the assistance of counsel for the MAG Committee, and the cost of Houlihan must therefore be considered in assessing such counsel's entitlement to an enhancement.

Turning next to whether counsel have properly guided their fiduciary clients, the court must assess this factor based on the conduct of those clients. The court recognizes that a client's determination to act in a given way may commit its attorney, despite contrary advice, to pursue that course of conduct. If this factor were being considered in assessing entitlement to a lodestar fee, the court would take this into account, especially upon a showing

that the client skirted the edge of its fiduciary duties against counsel's advice. In the context of the Pool Motion, however, the court may reasonably require near-perfect adherence to fiduciary responsibilities.

The court has noted in the past (*see In re Mirant Corp.*, 334 B.R. at 848) that it is satisfied that each of the statutory fiduciaries in these cases has adequately performed its fiduciary responsibilities. That being said, there have been minor lapses that justify counting this factor as not favoring enhancement as proposed in the Pool Motion.

The purpose of chapter 11 is to allocate value among stakeholders in a fair and equitable fashion. *See In re Combustion Eng'g*, 391 F.3d 190, 241–42 (3d Cir.2004); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 167 (D.N.J.2005). This means that each party in interest in a chapter 11 case should receive the treatment to which the facts and the law entitle it. In turn, this requires that each statutory fiduciary pursue its goals in a manner consistent with the rights and legitimate expectations of other parties in interest.

If, in the case at bar, counsel to statutory fiduciaries have consistently shown appreciation for the direct obligations of their clients to their beneficiary constituencies and Debtors' estates, they have nevertheless on occasion pursued overly aggressive tactics toward other parties. The most important example of this is found in the Valuation Hearing. Even if the attempt to exclude equity from meaningful participation under the Plan was a strategy principally advanced by the parties' financial advisors, it was one facilitated by

---

86. *Id.*

87. With the court's permission, Shearman & Sterling LLP applied for these costs in its Application under section 330.

counsel. Although the court would not penalize counsel for pursuing such a strategy, neither does the court believe such an effort merits enhancement of fees.

Similarly, Debtors' counsel has been admonished by this court and the Court of Appeals for overplaying Debtors' hand.[88] Counsel to the MAG Committee and counsel to Debtors were both cited by the court to the chair of the FRC, who, at the court's request, prepared a report addressing whether counsel were wastefully pursuing overly aggressive positions.[89] Although the resulting report was inconclusive, and the court accordingly found in it no reason to reduce lodestar fees, in considering the Pool Motion, any doubts about counsels' efforts must weigh the other way.

■ Certainly the court may consider any questionable aggressiveness of counsel when awarding fees. *See In re Fleming Co., Inc.*, 304 B.R. 85, 94 (Bankr.D.Del. 2003). In the case at bar, in considering the Pool Motion, the court concludes that the very good attendance to their fiduciary duties of the MAG Committee, the Corp Committee and Debtors certainly speaks well enough of counsels' advice to merit lodestar fees; but the incidents of overreaching are sufficient that this factor must weigh against granting the Pool Motion.

Finally, the court will consider the cost and quality of the services. With the exception of local counsel for the Debtors and the MAG Committee, counsel for all the statutory fiduciaries addressed in this section of this memorandum opinion have charged at hourly rates higher than rates that prevail in the Dallas–Fort Worth area.[90] The court does not find the work done by these attorneys to be of a higher quality than that performed by local attorneys charging lower hourly rates.[91] The court, accordingly, finds that this factor, too, weighs against granting the Pool Motion.

For all the foregoing reasons, the Pool Motion will be DENIED.

2. The Bonus Application

■ The Bonus Application presents a somewhat different situation. There is no question that counsel for the Equity Committee were as instrumental in the excellent result in these cases as were the attorneys for the other statutory fiduciaries. They also were relatively efficient. Even during the Valuation Hearing, when the fate of equity holders was at stake, the Equity Committee often had only two lawyers present. Despite the substantial opposition of the other parties and problems getting information, counsel to the Equity Committee have managed to represent their client efficiently throughout the case.

---

88. *See In re Mirant Corp.*, 197 Fed.Appx. 285 (5th Cir.2006); *In re Mirant Corp.*, 327 B.R. 262 (Bankr.N.D.Tex.2005); *In re Mirant Corp.*, 318 B.R. 377 (Bankr.N.D.Tex. 2004).

89. *See* Letter to the court from Nancy B. Rapoport dated December 29, 2004.

90. The following are some of the professionals' blended hourly rates: Andrews Kurth LLP: $362.98; Shearman & Sterling LLP: $461.84; White & Case LLP: $427.42; Cadwalader, Wickersham & Taft LLP: $417.59.

91. The blended hourly rate for Gardere Wynne Sewell LLP is $351.30 and the blended hourly rate for Forshey & Prostok, L.L.P. is $261.07. Forshey & Prostok, L.L.P.'s principal role in these cases—representing the New York Debtors since the effective date of the Plan—is not yet over, and the court would not consider a fee enhancement for the firm at this stage in any event. The blended hourly rate for Haynes & Boone, LLP is $306.37. Though this rate might suggest a bonus is in order, Haynes & Boone, LLP has not requested any fee enhancement except through the Pool Motion.

As to the Equity Committee's performance of its fiduciary duties, the court can find no fault. Certainly there is no instance of which the court is aware in which the position taken by the Equity Committee was so aggressive as to merit criticism even in the context of an enhancement of lodestar fees.

As to cost and quality of services, the blended rate of Brown Rudnick Berlack Israels LLP of $388.37 [92] is not higher than most of the other firms employed by statutory fiduciaries in these cases. Hohmann, Taube & Summers, LLP's blended rate of $281.10 is considerably lower. The quality of both counsels' work is on a par with that of the firms urging the Pool Motion.

For the foregoing reasons, the court concludes counsel for the Equity Committee are entitled to a fee enhancement. Based on the services rendered, the results achieved and the other factors considered by the court, Brown Rudnick Berlack Israels LLP will be awarded a fee enhancement of $400,000. Hohmann, Taube & Summers, LLP will be awarded an enhancement equal to 10% of the fees it has billed during the case, as reflected in

its Application under section 330, or $37,287.23. To such extent, the Bonus Application will be GRANTED.

3. The Examiner

■ The Examiner and his counsel have provided outstanding services in these cases. The Examiner played a key role in achieving a consensual plan, in the settlement of Debtors' disputes with Potomac Electric Power Co. and in fashioning numerous other settlements. The Examiner oversaw development of the mechanics leading to the Valuation Hearing. The Examiner has been central to resolution of inter-estate disputes such as the issue of hedging-in profits at the MIRMA level.

In performing his work the Examiner and his counsel have required the expenditure of only $4,465,985.65 of estate funds. The Examiner's record in these cases is best appreciated by comparing it to that of the examiner in the Enron cases, who charged the estate $87 million [93] and produced an investigative report rather than consensus on a plan.

The Examiner has performed his functions while limited by a budget. [94] Thus,

---

**92.** To determine Brown Rudnick Berlack Israels LLP's blended hourly rate, the court reduced the requested fees of $12,128,131 by $50,000 and divided that number by the 31,-099.90 hours expended as reflected in Exhibit A of Brown Rudnick Berlack Israels LLP's Application. The Application includes a request for fees of $50,000 which is an "[e]stimated amount to cover time and expenses for which entries were not yet made to the accounting system including time and expenses attributable to the Final Fee Hearing." The $50,000 is not accompanied by a detail of hours, so to include the $50,000 would distort the blended hourly rate calculation.

**93.** Meredith Jordan, *Alston & Bird wraps up work on Enron case,* Atlanta Business Chronicle, Jan. 9, 2004, *available at* http://www.bizjournals.com/atlanta/stories/2004/01/12/story4.html.

**94.** On April 7, 2004, the court entered its *"Order Directing Appointment of Examiner."* On May 27, 2004, the court entered its *"Amended and Restated Order Defining Role of Examiner."* In this amended order, the court authorized the Examiner to retain counsel and such other professionals as the Examiner deemed necessary. The Examiner was required to promptly report to the court any time that his rolling quarterly average billings (including his and his professionals' fees and expenses) would exceed $500,000. On July 30, 2004, the court entered its *"Memorandum Order Expanding Role of Examiner."* This expansion order increased the Examiner's budget from $500,000 per quarter to $900,000 per quarter.

the Examiner has provided efficient services in these cases.[95] The court is also fully satisfied with the Examiner's performance of his fiduciary duties.

As to quality of services, the court judges the work of the Examiner and his counsel to be on a par with that performed by their financial advisor (the Examiner) and attorney peers. Yet counsel to the Examiner billed at a blended rate of $351.30. Because representation of the Examiner was mostly by a partner and a senior associate, this is, in fact, a lower rate than first appears.[96]

The Examiner's outstanding work deserves special recognition. Gardere Wynne Sewell LLP, counsel to the Examiner, will be granted a fee enhancement equal to 10% of the fees billed during the case, as reflected in its Application under Code § 330, or $304,104.66. William Snyder, as Examiner, will be granted a fee enhancement of $200,000.

## VII. Conclusion

In conclusion, the court once again commends the professionals in these cases for their efforts in bringing about Debtors' successful reorganization. With few exceptions, the professionals have done outstanding work and have well-earned their fees.

Debtors are directed to submit orders to the court consistent with this opinion as follows:

1. A single order granting all the Applications dealt with in part III of this memorandum opinion and authorizing and directing Debtors to pay any amounts sought by such Applications which have not been paid;

2. A single order awarding success fees as described in part IV of this memorandum opinion and authorizing and directing Debtors to pay such fees (and any outstanding monthly fees or expenses) at such time as the order becomes final and not subject to further appeal;

3. Separate orders awarding (or denying) compensation and reimbursement under section 503(b) of the Code with respect to each of the Applications addressed in part V of this memorandum opinion, each such order authorizing and directing Debtors to pay any amounts thereby awarded at such time as such order becomes final and not subject to further appeal;

4. An order denying the Pool Motion;

5. An order granting the Bonus Application to the extent described above and authorizing and directing Debtors to pay the amounts thereby awarded at such time as such order becomes final and not subject to further appeal; and

6. An order awarding the Examiner a fee enhancement of $200,000 and awarding Gardere Wynne Sewell LLP a fee enhancement of $304,104.66 and authorizing and directing Debtors to pay such amounts.

---

95. The court must note that the one concern it had with the Examiner's efficiency was attendance (as observers) of two of his attorneys throughout the Valuation Hearing.

96. Richard M. Roberson graduated law school in 1978. His billable rates during these chapter 11 cases were $450 and $475. Michael P. Cooley graduated law school in 1999. His billable rates during these chapter 11 cases were $260 and $285. These two attorneys accounted for approximately 75.25% of the time spent by counsel representing the Examiner and the extent of their involvement raises the firm's blended rate.

## Appendix A

| Docket No.<br>Date | Party Seeking Compensation<br>and/or Expenses | Final Amounts Requested [1] |
|---|---|---|
| 13400<br><br>03/01/2006 | *White & Case LLP, Counsel to the<br>Debtors and Debtors–in–Possession | Fees: $80,104,489.50<br><br>Expenses: $5,581,271.10 |
| 13338<br><br>02/28/2006 | *Forshey & Prostok, L.L.P., Special<br>Conflicts Counsel for the Debtors<br>and Debtors–in–Possession | Fees: $4,334,542.03<br><br>Expenses: $242,176.94 |
| 13303<br><br>02/25/2006 | *KPMG LLP, Accountants and<br>Auditors for the Debtors and<br>Debtors–In–Possession | Fees: $30,533,034.80<br><br>Expenses: $907,831.89 |
| 13344<br><br>03/01/2006 | *Latham & Watkins, LLP, Special<br>Counsel for the Debtors and<br>Debtors–In–Possession | Fees: $4,027,406.56<br><br>Expenses: $157,959.17 |
| 13283<br><br>02/24/2006 | *McDermott Will & Emery LLP,<br>Special Counsel for the Debtors and<br>Debtors | Fees: $3,458,864.00<br><br>Expenses: $87,193.19 |
| 13353<br><br>03/01/2006 | *Skadden, Arps, Slate, Meagher &<br>Flom LLP, Special Counsel for the<br>Debtors and Debtors–In–Possession | Fees: $1,633,431.50<br><br>Expenses: $134,081.18 |
| 13301<br>02/25/2006<br><br>13803<br>(Amended)<br>04/24/2006 | *DLA Piper Rudnick Gray Cary US<br>LLP, Special Counsel for Debtors<br>and Debtors–In–Possession | Fees: $1,917,641.54<br><br>Expenses: $23,076.64 |
| 13299<br><br>02/25/2006 | *Mayer, Brown, Rowe & Maw LLP,<br>Special Counsel for Debtors and<br>Debtors–In–Possession | Fees: $958,898.41<br><br>Expenses: $50,143.55 |
| 13302<br><br>02/25/2006 | *Couch White, LLP, Special<br>Counsel for the Debtors and<br>Debtors–In–Possession | Fees: $2,926,550.32<br><br>Expenses: $125,279.21 |
| 13257<br>02/16/2006<br><br>13698<br>(Supplement)<br>04/04/2006 | *McKinsey & Company, Inc. United<br>States, Management Consultant for<br>the Debtors | Fees: $6,335,000.00 |
| 13359<br><br>03/01/2006 | *Novack and Macey, LLP, Special<br>Counsel for the Debtors and<br>Debtors–In–Possession | Fees: $3,079,562.28<br><br>Expenses: $433,341.34 |
| 13298<br>02/25/2006<br><br>13764<br>(Amended)<br>04/14/06 | *CRA International, Inc., Energy<br>Consultants for the Debtors and<br>Debtors–In–Possession | Fees: $7,548,847.97<br><br>Expenses: $954,927.68 |
| 13265<br><br>02/02/2006 | *Alston & Bird LLP, Special<br>Counsel for the Debtors and Debtors<br>In Possession | Fees: $2,271,263.89<br><br>Expenses: $411,327.70 |

1. These amounts are consistent with announcements made at the Hearing and may vary from the amounts listed in the Applications.

| Docket No.<br>Date | Party Seeking Compensation<br>and/or Expenses | Final Amounts Requested [1] |
|---|---|---|
| 13300<br><br>02/25/2006 | *PennEnergy, Inc., Turbine Marketers and Brokers for the Debtors and Debtors–In–Possession | Fees: $2,119,049.30<br><br>Expenses: $107,382.97 |
| 13444<br><br>3/07/2006 | *Hiscock & Barclay, LLP Special Counsel for the Debtors and Debtors–In–Possession | Fees: $2,121,552.30<br><br>Expenses: $107,382.97 |
| 13393<br><br>03/01/2006 | *Shearman & Sterling LLP, as Attorneys for the Official Committee of Unsecured Creditors of Mirant Corporation | Fees: $7,213,707.50<br><br>Expenses: $440,815.75 |
| 13387<br><br>03/01/2006 | *Capstone Advisory Group, LLC, Financial Advisors to the Official Committee of Unsecured Creditors of Mirant Corporation | Fees: $7,940,229.50<br><br>Expenses: $240,921.74 |
| 13398<br><br>03/01/2006 | *Andrews Kurth LLP, Co–Counsel to the Official Committee of Unsecured Creditors of Mirant Corporation | Fees: $13,917,860.50<br><br>Expenses: $2,107,437.08 |
| 13365<br><br>03/01/2006 | *Simpson Thacher & Bartlett LLP, Attorneys for the Corp. Committee | Fees: $2,481,607.50<br><br>Expenses: $162,107.01 |
| 13386<br><br>03/01/2006 | *PA Consulting Group, Inc., Consultant for the Official Committee of Unsecured Creditors of Mirant Corporation | Fees: $14,740,250.95<br><br>Expenses: $465,254.85 |
| 13379<br>03/01/2006<br><br>14123<br>(Supplement)<br>06/09/2006 | *Cadwalader, Wickersham & Taft LLP, as Attorneys for the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC | Fees: $12,622,217.00<br><br>Expenses: $901,366.24 |
| 13378<br><br>03/01/2006 | *Cox Smith Matthews Incorporated, as Attorneys to the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC | Fees: $1,429,779.00<br><br>Expenses: $395,939.56 |
| 13350<br><br>03/01/2006 | *Kroll Zolfo Cooper LLC as Forensic Accounting and Litigation Support Consultants to the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC | Fees: $6,303,954.75<br><br>Expenses: $220,415.29 |
| 13391<br><br>03/01/2006 | *E3 Consulting, LLC, Energy Consultants for the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC | Fees: $2,648,520.28<br><br>Expenses: $62,609.86 |
| 13383<br><br>03/01/2006 | *Haynes and Boone, LLP, Co–Counsel for the Debtors and Debtors–In–Possession | Fees: $9,780,766.00<br><br>Expenses: $959,644.27 |
| 13315<br><br>02/28/2006 | *Ernst & Young LLP, Advisors and Accountants for the Debtors and Debtors–In–Possession | Fees: $9,892,507.00<br><br>Expenses: $401,698.00 |
| 13251<br><br>02/16/2006 | *Heller Ehrman LLP, Special Counsel for the Debtors | Fees: $1,143,149.75<br><br>Expenses: $73,138.36 |
| 13352 | *Deloitte & Touche, LLP for Deloitte & Touche LLP, Consultant | Fees: $15,281,415.89 |

| Docket No. Date | Party Seeking Compensation and/or Expenses | Final Amounts Requested [1] |
|---|---|---|
| 03/01/2006 | and Tax Advisors to Debtors and Debtors–in–Possession | Fees: $376,172.71 |
| 13355 03/01/2006 | *Deloitte Tax LLP, Tax Service Provider to Debtors and Debtors–in– Possession | Fees: $10,447,943.54 <br> Expenses: $88,117.44 |
| 13354 03/01/2006 | *Deloitte Financial Advisory Services LLP, Accountant | Fees: $2,928,725.00 <br> Expenses: $213,774.90 |
| 13356 03/01/2006 | *Deloitte Consulting LLP, Advisors and Consultants to Debtors and Debtors–in–Possession | Fees: $2,113,774.00 <br> Expenses: $181,169.12 |
| 13362 03/01/2006 | *James M. Donnell, Energy Industry Consultant for the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC | Fees: $820,000.00 <br> Expenses: $26,386.69 |
| 13306 02/27/2006 | *Alvarez & Marsal Tax Advisory Services, LLP, Tax Advisors for the Debtors and Debtors–in–Possession | Fees: $758,920.50 <br> Expenses: $943.21 |
| 13348 03/01/2006 | *Baker Botts L.L.P., Special Counsel for the Debtors and Debtors–in–Possession | Fees: $886,944.75 <br> Expenses: $28,496.55 |
| 13340 02/28/2006 | *Beveridge & Diamond, P.C., Special Counsel for the Debtors and Debtors–in–Possession | Fees: $798,902.00 <br> Expenses: $16,925.03 |
| 13275 02/23/06 <br> 13688 (Amended) 03/31/2006 | *Broniec Associates, Inc., Accounts Payable Auditors for the Debtors and Debtors–in–Possession | Fees: $514,539.98 <br> Expenses: $0.00 |
| 13369 03/01/2006 | *Gibson, Dunn & Crutcher LLP, Special Counsel for the Debtors and Debtors–in–Possession | Fees: $449,350.50 <br> Expenses: $23,595.94 |
| 13370 03/01/2006 | *McKenna Long & Aldridge LLP, Special Litigation Counsel for the Debtors and Debtors–in–Possession | Fees: $49,755.50 <br> Expenses: $1,333.13 |
| 13286 02/24/2006 | *Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Special Counsel for the Debtors and Debtors–in–Possession | Fees: $52,248.50 <br> Expenses: $769.81 |
| 13396 03/01/2006 | *New Energy Associates, LLC, Energy Consultants for Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC | Fees: $491,537.50 <br> Expenses: $4,491.78 |
| 13363 03/01/2006 | *Osler, Hoskin & Harcourt LLP, Special Counsel for the Debtors and Debtors–in–Possession | Fees: $725,000.00 <br> Expenses: $13,000.00 |
| 13252 02/16/2006 | *Paul, Hastings, Janofsky & Walker LLP, Special Counsel for the Debtors and Debtors–in–Possession | Fees: $783,524.75 <br> Expenses: $58,599.08 |
| 13326 02/28/2006 | *PricewaterhouseCoopers LLP, Consultants for the Debtors and Debtors–in–Possession | Fees: $214,463.75 <br> Expenses $27,044.48 |

| Docket No. Date | Party Seeking Compensation and/or Expenses | Final Amounts Requested [1] |
|---|---|---|
| 13318 02/28/2006 | *Ryan & Company, Inc., Sales and Use Tax Consultants for the Debtors and Debtors–in–Possession | Fees: $478,669.34 Expenses: $0.00 |
| 13308 02/27/2006 | *Sitrick and Company, Inc., Corporate Communications Consultants for the Debtors and Debtors–in–Possession | Fees: $731,705.08 Expenses: $73,533.07 |
| 13371 03/01/2006 | *William Snyder, Examiner, and Corporate Revitalization Partners, LLC Financial Advisors for Examiner | Fees: $1,107,403.75 Expenses: $105,506.49 |
| 13374 03/01/2006 | *Underwood, Perkins & Ralston, P.C., Supplemental Counsel for William Snyder, Examiner | Fees: $37,975.00 Expenses: $2,110.50 |
| 13373 03/01/2006 | *Gardere Wynne Sewell LLP, Special Counsel to the Examiner | Fees: $3,041,046.60 Expenses: $212,028.81 |
| 13322 02/28/2006 | *Brown Rudnick Berlack Israels LLP for the Equity Committee | Fees: $12,128,131.00 Expenses: $3,110,182.49 |
| 13364 03/01/2006 14692 (Supplement) 10/12/2006 | *Hohmann, Taube & Summers, LLP, Attorneys for the Equity Committee | Fees: $372,872.25 Expenses: $62,652.89 |
| 13361 03/01/2006 | AP Services, LLC, Crisis Managers for the Debtors and Debtors–In–Possession | Fees: $25,727,235.00 (includes $4 million success fee) Expenses: $1,667,513.29 |
| 13390 03/01/2006 | Miller Buckfire & Co., LLC, Financial Advisor and Investment Banker to the Official Committee of Unsecured Creditors | Fees: $6,850,000.00 (includes $2.5 million transaction fee) Expenses: $262,567.98 |
| 13380 03/01/2006 | The Blackstone Group, L.P., Financial Advisor for the Debtors and Debtors–In–Possession | Fees: $14,322,524.19 (included $7 million restructuring fee) Expenses: $834,421.83 |
| 13366 03/01/2006 | Peter J. Solomon Company, Financial Advisors to the Equity Committee | Fees: $3,998,548.39 (does not include $3.2 million value-added fee) Expenses: $328,071.50 |
| 13358 03/01/2006 | Houlihan Lokey Howard & Zukin, Financial Advisors for the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC | Fees: $13,629,440.31 (includes $8,814,924.19 transaction fee) Expenses: $322,776.79 |
| 13337 02/28/2006 | Ad Hoc Committee of Mirant Corporation Creditors | Fees and Expenses: $284,509.10 ' |
| 13331; 13341–43; 13372 02/28/2006 | Wilson Shareholders: Frank Smith, Kent Koerper, Peter DePavloff, Bart Engram, Mary Leight, and L. Matt Wilson | Fees: $620,586.00 Expenses: $24,560.64 |
| 13388 | Phoenix Entities | Fees: $4,965,418.68 |

| Docket No. Date | Party Seeking Compensation and/or Expenses | Final Amounts Requested[1] |
|---|---|---|
| 03/01/2006 (prior motion filed 1/9/2006 (docket no. 12974)) | | Expenses: $315,355.18 |
| 13115 01/24/2006 | Sierra Liquidity Fund Creditors seeking reimbursement for Warner Stevens, L.L.P. | Fees: $75,000.00 Expenses: $0.00 |
| 13368 03/01/2006 | Ad Hoc Committee of Bondholders of MAG | Fees: $2,788,808.61 Expenses: $95,285.44 |